**HART v. GREIS et al.**

No. 14215.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 24, 1941.

Rehearing Denied Nov. 21, 1941.

T. R. Boone, of Wichita Falls, Donald & Donald, of Bowie, and Kearby Peery, of Wichita Falls, for appellant.

Kilgore & Rogers, of Wichita Falls, for appellees.

McDONALD, Chief Justice.

This suit is in the form of trespass to try title, but the parties agree that the sole issue is one of boundary. Plaintiffs claim to be the owners in fee of the surface and the minerals, and defendant claims under a mineral lease issued to him on December 23, 1938, by Wm. H. McDonald, Commissioner of the General Land Office, covering the land in controversy, which is a tract containing 101.1 acres, lying in Wichita County. Defendant claims that the land in question is vacant, unpatented land, lying between the E. Durain and the M. L. Gahagan Surveys. Plaintiffs claim that there is no vacancy between the two surveys.

Upon answers of the jury to special issues, finding in effect that there was no vacancy, the trial court rendered judgment in favor of the plaintiffs. The defendant has appealed, seeking a reversal of the judgment upon five grounds: (1) Insuffi-

ciency of the evidence to support the verdict of the jury. (2) Error in the admission in evidence of certain proceedings and a surveyor's report in a suit tried in 1904, styled Stokes v. Hamilton. (3) Error in failing to instruct the jury regarding the superiority of calls. (4) Misconduct on the part of certain jurors in relating to the other jurors their personal knowledge and observations of changes in the Wichita River. (5) Misconduct on the part of the jury in the use of a vara scale. These contentions will be discussed in the above order. The parties will be designated as they were in the trial court.

We include here a rough sketch showing the general location of the E. Durain, M. L. Gahagan and nearby surveys:

suit, is the fact that the surveys upon which the patents were issued may have been made on the ground in 1856, and not in 1866 and 1867. We do not believe that this time element relates to anything more than the weight of certain evidence.

Surveys 30 and 39 were both lifted, perhaps due to the fact that they were fractional surveys. The E. Durain was subsequently patented on de Cordova's notes for Survey 30. In the year 1883, Surveyor A. Warren filed field notes upon which the M. L. Gahagan Survey was patented.

In the surveys made by both Cloud and de Cordova, Surveys 30 and 39 adjoined on their respective east and west boundary lines; the north line of each was 1900 varas, running on a course of north 72 de-

The sketch is not drawn to scale, and is for purposes of illustration only. Defendant contends that the east line of the Durain and the west line of the Gahagan are 285.3 varas apart, resulting in the alleged vacancy.

In 1856, Surveyor Wm. Cloud laid out for the G. H. & H. Ry. Co. a system of surveys which included most, if not all, of the land in controversy. These surveys were lifted, and in 1866 and 1867, Surveyor J. R. de Cordova filed field notes for a system of surveys for the H. & T. C. Ry. Co. De Cordova's notes appear to be identical with Cloud's notes, even showing the same chain carriers, which suggests that de Cordova may not have gone upon the ground, but simply copied Cloud's notes. The only materiality of this, for the purposes of this

grees east; and their south boundaries lay along the Wichita River, sometimes referred to as the Big Wichita River.

The Gahagan field notes do not call for an adjoinder with the E. Durain Survey, although the plat on the field notes filed by Surveyor Warren shows the two surveys adjoining.

The ultimate inquiry is whether the east line of the Gahagan was actually laid by Surveyor Warren, on the ground, along or east of the east line of the old Survey 39. The surveyors for both sides were unable to find anything on the ground to designate the west line of the Gahagan and were compelled to locate it by course and distance, south 72 degrees west 1900 varas, from what they thought to be the east line of the Gahagan.

The Gahagan was located in this manner. In 1880, Surveyor C. B. Patterson surveyed and filed field notes for the Banta, Campbell, Beckham, Davis, Gibbs, and Howard Surveys. The beginning point of his surveys in this area was a point he had located as being the northeast corner of Section 26 of the H. & T. C. Ry. Co. Surveys. He filed a report, and a sketch accompanying it, in the General Land Office, saying that he had located the northeast corner of Section 26 from six original corners he had located in the system of H. & T. C. Surveys, three of them in Block Five and three of them in Block Seven. The closest of the original corners so located by him, the southwest corner of Section 14, was three miles from the northeast corner of Section 26.

The total of Patterson's calls for the west lines of the Banta, Campbell, and Beckham is 3800 varas, which coincides with the total of the called lengths of the east lines of Sections 26 and 27. He calls for the northwest and beginning corner of the Banta to be at the northeast corner of Section 26, and calls for the southwest corner of the Beckham to be at the southeast corner of Section 27. Patterson then calls the south line of the Beckham to go north 72 degrees east 2449 varas. Since the southeast corner of Section 27 is at the northwest corner of Section 30, and since the north line of Section 30 is also called to follow a course of north 72 degrees east, it must be construed that Patterson called the south line of the Beckham to follow what he thought was the north line of Sections 30 and 39. He calls the most southern southwest corner of the Gibbs to be at the southeast corner of the Beckham and on the north line of Section 39. He calls the south line of the Gibbs to run north 72 degrees east 1351 varas, to the northeast corner of Section 39. Therefore, according to Patterson's calls, the south lines of the Beckham and the Gibbs run from the northwest corner of Section 30 to the northeast corner of Section 39.

Patterson calls the northwest and beginning corner of the Howard Survey to be in the east line of Section 39 (the Gahagan had not yet been surveyed by Warren) 800 varas south 18 degrees east from its northeast corner. The next call is for a course south 18 degrees east 760 varas.

Surveyor Warren calls the southeast and beginning corner of the Gahagan to be at the southwest corner of the Howard. He calls the east line of the Gahagan to go north 18 degrees west 1560 varas to the southeast corner of the Gibbs, which latter corner, as we have said, is called by Patterson to be at the northeast corner of Section 39. This distance coincides with the calls of the Howard.

The call for the north line of the Gahagan is south 72 degrees west 1900 varas.

To establish a vacancy between the two surveys, it is necessary to find that either Patterson or Warren, or both, made their surveys on the ground in conflict with the calls in their field notes.

■ A case of this nature presents the greatest difficulties, both to the surveyors and to the courts. But, as we said in Turnbow v. Bland, 149 S.W.2d 604, 611, writ of error dismissed: "Titles to land are not to fail merely because old markers may have disappeared, or because it may be difficult to trace the footsteps of the surveyor."

■ The case was tried by all parties on the theory that the surveys were actually made on the ground, and the testimony related to the search for the footsteps of the surveyors. As we also said in the Turnbow case: "In all of the cases, from Stafford v. King, 30 Tex. 257, 94 Am.Dec. 304, on down, the law has been that search must be made for the footsteps of the surveyor, and that, when found, the case is solved."

There being no witness who could say of his own knowledge where these surveyors actually went on the ground, and none of the original markings, bearing trees or other objects called for in the notes of either the Durain or the Gahagan having been found in place, the evidence to which resort was had was necessarily circumstantial and hearsay in character. The surveyor witnesses made many statements, without objection from the opposing side, which were obviously mere conclusions on their part, and must be treated by us as such.

The lengthiest discussion we have been able to find of the rules of evidence applicable in cases like this one is found in Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, 300, writ of error dismissed, where it is said: "Every rule of evidence laid down for guidance in boundary questions is for the purpose of ascertaining the true location of the line in dispute, by which is meant the place at which the original surveyor ran the line. After 90 years have elapsed and time has destroyed in large measure the evidence left by the original locater, it is then permissible, not only per-

missible, but of necessity is required, that we resort to any evidence tending to establish the place of the original footsteps which meets the requirement that it is the best evidence of which the case is susceptible."

In a case like this, where the nearest corners even pretended to have been located from objects on the ground were from two to five miles and further away, almost any information tending to throw light on the location of the lines in dispute, even though vague or remote in character, has to be considered.

The testimony of the surveyor witnesses is so complicated that it would be impossible to discuss it in detail in an opinion of reasonable length. A considerable part of the testimony has been difficult, if not impossible, to review, because counsel and the witnesses frequently referred to maps which were before them, and to lines and corners on the maps, without identifying for the record the maps which were being examined, or the lines and corners which were being pointed out. The jury, being present and able to see the maps and the lines and corners being pointed out, were in better position than are we to pass upon such portions of the testimony.

In passing upon the sufficiency of the evidence to support the jury's verdict, the familiar rule is: "A reviewing court will consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party who obtained the verdict; that is to say, every presumption arising from the evidence will be resolved in favor of the verdict or the judgment based thereon, in the absence of a showing to the contrary. In considering controverted issues of fact, the appellate court will accept as true that testimony which tends to support the verdict and judgment." 3 Tex.Jur., page 1058.

Plaintiffs used as witnesses the surveyors Corlett and Hand. Defendant used as a witness the surveyor Klotz. Both surveyors prepared maps or plats purporting to show the results of the work they had done, and to present the respective theories of the parties as to the locations of lines and corners material to the controversy.

Corlett testified as to the manner in which he had attempted to locate the beginning point of Block 7, which was the northwest corner of Section 1; the southwest corners of Sections 1, 2 and 3; the southwest corner of Section 9; the northwest corners of Sections 14 and 13; the north lines of Sections 13 and 23; the northeast corner and the east line of Section 23; the east lines of Sections 23, 22, 21 and 20, and the southeast corner of Section 20. That by course and distance from what he had established as the southeast corner of Section 20, he located the northwest and northeast corners of Section 30, the E. Durain Survey. That he had located his lines and corners from natural objects found upon the ground, relying heavily in several instances upon passing creek calls. Klotz testified in somewhat the same manner as to his location of certain lines and corners in the H. & T. C. system, saying that he had studied all of the field notes of the original surveyors, that he had run out some of the lines, that he located some of his lines and corners from what he considered evidence on the ground, and that he agreed with the location made by the surveyor Patterson of the northeast corner of Section 26. The study of the testimony of these surveyors has been extremely tedious, particularly on account of the failure, already mentioned, to identify maps, corners and lines, in such way as to reflect them in the statement of facts. If we have correctly construed his testimony, the nearest corners or lines claimed to have been located by Corlett from objects on the ground were the southwest corner of Section 9 and the east lines of Sections 23 and 22. He located the southeast corner of Section 20 by extending south 18 degrees east the east line of Sections 23 and 22, until it intersected another line running north 72 degrees east from the southwest corner of Section 9. He located the northwest and northeast corners of the Durain from the southeast corner of Section 20 as thus located. So it may be said that his location of the boundary line in dispute was made from corners and lines he had located some five or six miles away. The surveyor Klotz found himself in somewhat the same difficulty. As well as we can interpret his testimony, he located the northeast corner of Section 26 by course and distance from the point he had located as the northwest corner of Section 14, and felt that his location of the northeast corner of Section 26 was supported by calls for crossing Beaver Creek. We observe, however, that Klotz testified that the first surveying he did in this area was done in the year 1938, at which time he located what he considered the vacancy in question by

course and distance from a fence corner which he thought to be the southwest corner of Section 27. He did not testify as to the basis of his belief that the fence corner was the true corner of the section. The surveying he did to locate the lines and corners in the central, northern and western part of Block 7 was done more than a year later, indicating that he had arrived at an opinion as to the location of the lines of the Durain before he did this latter surveying.

Both Klotz and Corlett, in their respective reconstructions of the surveys mentioned, found that some of the courses and distances varied from those shown in the original field notes, Klotz finding an excess of as much as 137 varas in certain lines, and Corlett finding excesses running as much as 147 varas.

Defendant urges that Klotz's location of the northeast corner of Section 26, the west line of the Durain and from it the east line of the Durain, are conclusively proved, and that Corlett's locations are conclusively disproved, by the two following circumstances.

■ As has been mentioned, the surveyor Patterson, in 1880, undertook to relocate the northeast corner of Section 26. Defendant argues that since Patterson was upon the ground only a few years after the original surveys were made, his opportunities of locating the true lines were immeasurably better than those of the surveyors who testified in this suit. But, as will be discussed later, defendant charges that in every other survey made by Patterson, his work on the ground was at variance with his field notes. And Patterson himself, in the report made in the Stokes v. Hamilton case, discussed later, confessed an error of more than 300 varas in making the Davis survey. We do not consider that the jury in this case was required, as a matter of law, to accept as correct Patterson's report of his relocation of the northeast corner of Section 26.

The other circumstance is this: The original field notes of Cloud and de Cordova call for the southeast corner of Section 28, the northeast corner of Section 29, and the southwest corner of Section 30 (the Durain), to be on the bank of the Wichita River. The field notes of the Durain call for the south boundary to be along the Wichita River, indicating, if the notes are correct, that the river at that time ran in a northeasterly direction from the southwest corner of Section 30. The plat shown at the top of the page upon which are written the field notes of Section 30, as do the plats accompanying the notes of 28 and 29, show the river running in a northeasterly direction from this point. From the testimony it appears that the river now runs in a northerly direction at the southwest corner of Section 30, and then turns and runs in a northwesterly direction into Section 28, curving toward the east somewhere near the northwest corner of Section 30. Near the southwest corner of Section 30 there is a high bank, some fifteen or twenty feet high, on the east side, or what would be considered the south side of the river running from its source to its mouth. This high bank now runs in a northerly direction some distance north of the south lines of Sections 28 and 30, and then turns, as does the river, to the northwest and into Section 28.

Klotz's location of the southwest corner of the Durain, or Section 30, is a few varas west of this high bank. Corlett's location of this corner lies some distance east of this high bank. Defendant argues that since this corner was originally called to be on the north bank (which at this point would be the most westerly bank) of the river, and since the current at this point flows against the east or south bank, Corlett's location of the corner to the east of the east or south bank of the river is in defiance of the laws of nature, in that this high bank might have eroded and moved to the east, but could never have built up and moved to the west.

Defendant overlooks the fact that the north bank of the river, if the calls in the original notes are correct, at one time ran along the south line of the Durain, and that the south bank was somewhere south of the north bank. If the notes are incorrect as to the location of the river along the south line of the Durain, then they may not be correct as to the location of the southwest corner on the north bank of the river. The evidence shows without dispute that the Wichita River in this area occupies a broad valley a mile or more in width, that the soil is sandy and easily erodes, and that the river will sometimes leave its old channel, and run in a new channel in another part of the valley after a single heavy rain. The jury could have reasonably inferred, from the circumstances quoted, that the river left the channel running along the south line of the Durain after the Cloud survey was made, and that the high bank in question was cut after the river ceased to flow along

the south line of the Durain. Such a conclusion is almost inescapable if the call for the river to run along the south line of the Durain is correct.

■ It is our opinion that the jury, from the conflicting evidence, could reasonably locate the east line of the Durain Survey according to the theories presented by the plaintiffs.

Klotz testified that he located the recognized northwest corner of the Cook. That he found the southwest corner of the Cook 2100 varas south of its northwest corner. That he then located what he considered the corners of the Banta, finding the north and south lines of the Banta 121 varas longer than called for in the original notes. It is not quite clear to us how he located the northwest corner of the Campbell, which is the southwest corner of the Banta. He found what he considered the southwest corner of the Campbell at the call distance from its northwest corner, finding there an old rock pile. Surveying east along the south line of the Campbell 557 varas, the call distance, he found nothing, but at 686.4 varas he found a pile of stones. At approximately the call distance north of this point he found the point he had located as the southwest corner of the Cook. Although the calls of the Beckham run anticlockwise, Klotz reversed the calls of the Beckham, beginning at the point he had located as the southwest corner of the Cook and surveying east. At 954.1 varas (call distance 950 varas) he did not pick up any natural object. Turning south, at 658½ varas (call distance 950 varas) he found an old rock pile in a rocky ravine, which he considered was the point actually fixed on the ground by Patterson as the southwest corner of the Davis. Going east, at 1068.8 varas (call distance 950 varas) he found a pile of stone, and what he considered the original witness tree in the proper place, for the southeast corner of the Davis. Klotz took a picture of the pile of stone and the alleged witness tree, and introduced the picture in evidence. Continuing east, at 529.8 varas (call distance 530 varas) he found a rock for the most southern northeast corner of the Beckham. Klotz's statement that this was the corner of the Beckham, or that this stone was the original marker, was necessarily a conclusion on his part, and it may be observed that the field notes of the Beckham call for a stake, and not a stone, at this corner. Turning south, at 457.6 varas (call distance 453.6 varas) he found an old mes-

quite stake in the valley, for the southeast corner of the Beckham. He took a picture of the stake and introduced it in evidence. The Beckham notes call for a stone, not a stake, at this corner.

The southeast corner of the Beckham, as located by Klotz, is 2745 varas from the southwest corner as he located it, which is 294 varas in excess of the distance called for in the original field notes.

Klotz then ran course and distance from what he had located as the southeast corner of the Beckham, to establish the south line and the southeast corner of the Gibbs.

The surveyor Corlett, to locate the southeast corner of the Gibbs, first began at the point he thought to be the northwest corner of the Cook. We believe from the record that Klotz and Corlett found this corner to be at the same place. We also believe that they located the northeast corner of the Banta at the same place. He located the southwest corner of the Cook by reversing its last call from the southeast corner of the old Mays Survey. We are not able to tell from the record whether Klotz and Corlett differ as to this corner. From the northeast corner of the Banta he ran the call course and distance to establish the northwest and beginning corner of the Banta. He could not identify this corner from anything on the ground, but testified that it was within 12 varas of the call course and distance from what he considered to be the northwest corner of Section 14, the "hackberry grove" corner. Corlett figured that he was at the point which Patterson had established as the northeast corner of Section 26, and the northwest corner of the Banta. Running south 18 degrees east along the west line of the Banta, he crossed Beaver Creek at the call distance of 200 varas, and at 400 varas, the distance called for in the field notes, he found a set stone, for the southwest corner of the Banta, finding that a hill, called for in the field notes, had the proper bearing of south 56 degrees 30 minutes west about 900 varas. He then continued south 18 degrees east for the southwest corner of the Campbell; and thence east 557 varas, the call distance, for the southeast corner of the Campbell where he found an old pile of stone, and which point he found to be 138½ varas, the call distance, south of the point he had located as the southwest corner of the Cook.

Corlett then ran out the Beckham, surveying anti-clockwise in the order of the origi-

nal field notes. He began at the southwest corner of the Cook, going to the southeast and then to the southwest corners of the Campbell, and then south 18 degrees east the call distance of 2130 varas to a point for the southwest corner of the Beckham. This point he found to be south and west of the point he considered to be the southeast corner of Section 27, and therefore south of what he considered to be the north line of the Durain, indicating, in Corlett's opinion, that Patterson's survey conflicted with the H. & T. C. surveys. Corlett found no natural objects at this corner. He then located the southeast corner of the Beckham by course and distance from its southwest corner, north 72 degrees east 2449 varas.

At the point he located as the southeast corner of the Beckham, Corlett found himself 52.7 varas north of the north fence line of the property owner in the Gahagan Survey, while Klotz's south line of the Beckham is some 300 varas north of this fence line. Corlett testified that he then ran north 72 degrees east 1310 varas (call distance 1351 varas) for the southeast corner of the Gibbs, and 41 varas further on the same course for the northeast corner of the old Section 39. The testimony of the witness as shown in the statement of facts is not clear as to why he ran only 1310 varas for the south line of the Gibbs, and why he stated that he ran 41 varas on to the northeast corner of Section 39. We notice that Patterson, in the report he filed in the Stokes v. Hamilton case, showed the south line of the Gibbs to be 1310 varas long, and we also notice that Corlett on his map shows the northeast corner of Section 39 to be about 144 varas easterly and 176 varas northerly from the point mentioned. The only reasonable interpretation we can place upon the witness's testimony is that he intended to say that he was at the northeast corner of Section 39 as it was located by Patterson in making the Gibbs Survey, although this interpretation appears to leave an unexplained discrepancy of 41 varas.

He then ran south 18 degrees east 800 varas for the beginning corner of the Howard, and from there 760 varas on the same course to establish the southwest corner of the Howard, and the southeast and beginning corner of the Gahagan. From the last point he ran the call distance, 1560 varas north 18 degrees west, for the northeast corner of the Gahagan. At that point he found a rocky point bearing south 15 degrees 45 minutes west as called for in the field notes. He then ran south 72 degrees west 1900 varas, the call course and distance, for the northwest corner of the Gahagan, finding it to be 179.7 varas south 72 degrees west of the east line of the Durain as he had located it. Thus, according to Corlett, there is an overlapping of the two surveys.

Klotz, in his efforts to locate the boundaries of the Howard, thought that he had located the remains of some witness trees, but his testimony is speculative as to their identity.

Defendant presents another circumstance as evidence that the Durain and Gahagan Surveys do not adjoin. The east line of the Durain is called to run 950 varas northerly from the Wichita River, while the west line of the Gahagan is called to run 1720 varas northerly from the river. Defendant argues that it would be impossible for these two lines to be the same, with one of them 770 varas longer than the other. But it is to be remembered that the river in that area has admittedly made great changes in its course. The Durain was surveyed by Cloud in 1856, and by de Cordova, if he in fact made his survey on the ground, in 1867. The Gahagan was not surveyed until 1883. It is possible that the channel of the river could have changed that distance during those years.

Neither surveyor contends that Patterson began his surveys east of the east line of Section 26. So defendant's theory of a vacancy has as its basis the proposition that Patterson was accurate in his location of the northeast corner of Section 26, but that he was inaccurate in his calls for the aggregate distance in the west lines of the Banta, Campbell and Beckham, in his call for the southwest corner of the Beckham to be at the southeast corner of Section 27, in his calls for the north and south lines of the Banta, Campbell, Beckham and Davis, in his location of the south lines of the Beckham and Gibbs on the north lines of Sections 30 and 39, in his call for the southeast corner of the Gibbs to be at the northeast corner of Section 39, in his location of the north line of the Gibbs on the south line of the Cook, and in his location of the west line of the Howard on the east line of Section 39.

The evidence being conflicting, and, to us, the testimony of Corlett appearing as reasonable as that of Klotz, it is our opin-

ion that the evidence was sufficient to support the verdict of the jury as to the location of the west line of the Gahagan.

There appear to us to be some discrepancies in the testimony of both surveyors which we have not been able to reconcile, which may be due to the fact, above mentioned, that frequently counsel and the witness failed to identify for the record the maps, corners and lines being referred to during the trial.

In 1904, there was tried in the District Court of Wichita County a certain suit styled Stokes v. Hamilton, involving a boundary dispute between owners in the Gahagan, Gibbs and Beckham Surveys. The surveyor C. B. Patterson filed in that case a report of a resurvey he had made of some of this area, indicating that his original survey of the Davis, and possibly some of his other surveys, were inaccurate. Defendant objected to the admission in evidence of the pleadings and judgment in the case, and Patterson's report therein. We think that no error was committed in this respect. Patterson was dead at the time of the trial of the suit now on appeal. Nothing being found on the ground at the west line of the Gahagan, it had to be located either from other calls of the Gahagan, or from any other evidence which, under the language of the Taylor v. Higgins Oil & Fuel Co. case, "meets the requirement that it is the best evidence of which the case is susceptible." Klotz had, previous to the introduction of this matter in evidence, referred to Patterson's relocation of his corners of the Davis. The report tended to show that Patterson's work was not always accurate. It was the kind of a case where almost any and every kind of information available was needed. In 7 Tex.Jur., page 223, it is said: "The field notes of a surveyor who was in position to know the boundaries of a survey are admissible as declarations, and as an exception to the hearsay rule if it is proved that they are in his handwriting and that he is dead at the time they are introduced in evidence."

Defendant having challenged the authenticity of the report, the other proceedings in the case were admissible, not only to establish the authenticity of the report, but to explain the report by showing what problem confronted Patterson when he made his resurvey and his report to the court. See Blaffer v. State, Tex.Civ.App., 31 S.W.2d 172; Stroud v. Springfield, 28 Tex. 649; Pierce v. Schram, Tex.Civ.App., 53 S.W. 716.

Special issues 1, 2, 3 and 4 inquired of the jury, in effect, (1) whether the east line of the Durain as shown on the Klotz map was the line "originally located" by Cloud and de Cordova, (2) whether the east line of the Durain, as "originally located" on the ground by Cloud and de Cordova, ran east of the line as shown on the Klotz map, (3) how far east of the line shown on the Klotz map was the east line of the Durain as originally located on the ground by Cloud and de Cordova, and (4) whether the west line of the Gahagan as shown on the Klotz map represented the line as "originally located" on the ground by Cloud and de Cordova. Defendant objected to the court's charge as follows:

"The defendant excepts to the court's charge in that the court does not instruct the jury with reference to the law of this case as to how, or in what manner, they should be directed to find the west boundary line of the Gahagan survey as originally located by Warren in 1883, or to find the east boundary line of the E. Durain Survey as originally located by Cloud in 1857, and at this time the defendant requests the court to properly instruct the jury pertaining to the law of the case, that the jury are to be bound by, in attempting to locate the respective lines inquired about in Issues Nos. 1 and 2, and at this time the defendant here and now requests the court to so charge the jury with reference to the law pertaining to how and in what manner the jury may arrive at the west boundary line of the Gahagan survey, as well as the east boundary line of the E. Durain Survey, as said jury is not given, in the present charge of the court, the law as to how they may determine these respective boundary lines, and without the law being so given to them by the court, the jury are turned loose to guess at the law as to which is superior:

"(1) The course and distance called for in the field notes of the original survey.

"(2) The natural and artificial evidences on the ground now found and now shown as were called for in the original field notes of the surveyor locating the respective surveys in question.

"In this connection the court not having given any charge pertaining thereto, the defendant here and now requests of court to give some instruction pertaining to how

the jury may determine these respective lines."

Defendant presented and the court refused the following requested special instruction: "In connection with Special Issues 1, 2, 3, and 4, wherein the court has asked you to find where said surveys were 'originally located' by the respective surveyors Warren and Cloud, you are instructed that said phrase 'originally located' by the respective surveyors means that you shall take into consideration in locating said respective surveys first, the nearest natural objects to said respective tracts of land called for in the Field Notes of the respective surveyors and thereafter as secondary, you shall take into consideration the artificial objects called for in the respective Field Notes of said Surveys— made by said surveyors, and, third, the course and distance called for in the Field Notes of the respective surveys made by said respective surveyors, and be governed thereby in finding where said surveys were 'originally located' on the ground by the respective surveyors at the times called for in said issues."

The court did not give any definitions or instructions in his charge, except that the jury should answer the facts as they found them to be, without regard to the legal effect of their answers, and that they should be the exclusive judges of the facts proven, etc.

Defendant's proposition, based upon the above objection and requested instruction, is: "In a boundary suit where the calls for natural objects, artificial objects and course and distance, are conflicting, it is the duty of the court to instruct the jury as to the superiority of the respective calls, and where the defendant duly tendered a proper instruction and further excepted to the court's failure to give any instruction with reference to the superiority of the calls, the same constitutes reversible error."

His assignment of error, upon which the proposition is based, is: "The court erred in failing to give to the jury the definition of the term 'originally located' as tendered by the defendant, C. R. Hart, in this case, and further erred in failing and refusing to give the jury any instruction as to the superiority of the respective calls, that would control them in the location of the true boundary lines in question, as shown by the record herein, and further erred in not instructing the jury as to the seniority of calls for natural and artificial objects and calls for course and distance."

In his assignment of error defendant complains of two separate actions of the court, to-wit, the failure of the court to give instructions on the law, and the failure of the court to submit the requested definition of the term "originally located". It is not clear to us which action of the court is presented as error in defendant's proposition.

The assignment of error is multifarious, and under the well settled rules does not require consideration. But even if it be considered, it is without merit.

Considering first the objection to the charge, the rule is that the court is not required to submit instructions on the law in a special issue case.

"Sec. 326. Charging as to the Law.— We have already observed (Sec. 218) that the methods of submitting cases to juries for determination by a general verdict and upon special issues are widely divergent. It is settled by many authorities that in cases submitted upon special issues it is not proper for the court to give a general charge on the law of the case or on a phase of the case; and so requests for general charges are properly refused. The court in such cases is limited in its instructions to the giving of such explanations and definitions of legal terms as are necessary to enable the jury properly to pass upon and render a verdict on the issue submitted, R. S. art. 2189, and so long as the court stays within these bounds an objection that the charge is a general one is not sustainable." 41 Tex.Jur., page 1181.

The objection is too general to point out to the court what instruction is desired. It makes no reference to the Patterson surveys. The record presents no case of conflict of calls in either the Gahagan or the Durain. Both surveyors ran these surveys according to their calls for course and distance. The objection does not specifically refer to the other surveys in the H. & T. C. system. If it was defendant's purpose to have the court instruct the jury to give effect to the rule of priority of calls in determining the lines and corners of these other surveys, it may be observed that all the surveyors claimed to have given priority to calls for natural objects in their attempts to relocate the material lines and corners. There was

nothing in the record from which the jury could have believed that any other rule applied. Apparently they accepted Corlett's relocation of the lines and corners in controversy, and Corlett positively testified that he followed the rule of priority mentioned. If they believed Corlett, they could have arrived at no other verdict. Had they believed and accepted Klotz's theories, they would likewise have followed the same rule of priority.

If defendant's proposition is based upon the refusal to submit his requested instruction, purporting to be a definition of the term "originally located", no error is presented.

In the first place, the instruction is not a definition of such term. Nor do we believe that the term "originally located" required definition. The jury could not have misunderstood the meaning of these words. Their difficult problem was to determine where the lines were in fact originally located. In the second place, the definition, or instruction, is not correct as applied to the facts of this case. It appears to be limited to the lines of the Durain and Gahagan surveys, concerning which the record does not, as we have said, present any problem of conflict of calls. If it is intended to refer to calls of other surveys in the H. & T. C. system, it does not represent a correct interpretation of the law. The jury is instructed to give first consideration to the nearest natural objects. The nearest natural object might not be the most reliable. There is no doubt as to defendant's purpose in requesting this instruction. He wished the jury to believe that the call for the Wichita River should control over any other call. But it is undisputed that the Wichita River in that area varies in its course as much as a mile. A more distant object, such as a hill, might be a more reliable guide.

Upon motion for new trial defendant sought to establish misconduct on the part of the jury in two respects. The first related to discussion by some of the jurors of their personal observations of changes in the Wichita River. The second related to use of a vara scale by some of the jurors in their study of the Klotz map.

The witnesses for both parties testified, without contradiction, that changes in the channel of the river were of common occurrence. We have carefully examined the testimony of the jurors relating to what was said in the jury room, and are unwilling to hold that reversible error has been shown. The two jurors who testified were rather vague about what was said in the jury room. The most we find in their testimony is that some of the jurors said that they had noticed changes of the kind as were said by all of the witnesses to have occurred. Particularly in view of what we have pointed out in this opinion about the location of the high bank, and about the course of the river as indicated in the field notes of Cloud and de Cordova, and in view of the act of the trial court in overruling the motion for new trial after having heard the testimony during the trial and upon the motion for new trial, we are convinced that no injury could have resulted to defendant from the type of remarks indicated by the testimony of the two jurors.

The Klotz map was taken by the jury to their room when they retired to consider their verdict. In writing they requested a vara scale. With the consent of all parties the court furnished the jury with a vara scale. It is claimed that some of the jurors, in attempting to apply the scale to the Klotz map, stated to other jurors that the use of the scale revealed that the map was not accurate. The testimony of the two jurors who testified is vague as to what took place. It is clear to us that any error which may have been committed was invited by defendant. When he consented to the delivery of the scale to the jury, he must have known that they would use it for only one purpose, to measure distances on the Klotz map, and that if they observed, or only thought they observed, any inaccuracy on the map, they would discuss it among themselves.

This case reveals the great degree of speculation attendant upon efforts to locate boundary lines of a survey, where nothing called for in the field notes of the particular survey is found upon the ground, merely by course and distance from points several miles away, especially where it is asserted by the surveyors for both parties that a considerable part of the work of the old surveyors has been found to be inaccurate. The fence line, which has existed thirty-five years or more, between plaintiffs and the property owners to the east of them, runs practically along the east line of the alleged vacancy. Not forgetting the classic rule that the burden of proof is always upon the plaintiff, we believe that

under facts· like those . presented here, where all the original field notes and official plats negative the existence of a vacancy, and where the evidence offered by plaintiffs·is.as reasonable as that offered by defendant, a vacancy ought not be found except upon evidence more· definite and satisfactory .than that produced by defendant.

The judgment of the trial court is affirmed.