## HUMBLE OIL & REFINING CO. et al. v. STATE et al.

### No. 9010.

Court of Civil Appeals of Texas. Austin.

March 4, 1942.

Rehearings Denied May 6, 1942.

Dan Moody, of Austin, Thompson & Barwise and B. V. Thompson, all of Ft. Worth, Joe S. Brown and Irwin W. Coleman, both of Houston, Wm. K. Hall and Chas. L. Morgan, both of Ft. Worth, Ramey, Calhoun & Marsh, of Tyler, Blalock, Blalock, Lohman & Blalock, of Houston, Thos. Y. Banks, of San Antonio, Jack

Roberts, of Austin, W. J. Garrett, of Jacksonville, Robert S. Durno, of Houston, Saye & Saye, of Longview, L. L. James, of Tyler, W. H. Sanford, Thompson, Knight, Baker, Harris & Wright, and Sol Goodell, all of Dallas, J. M. Johnson, of Houston, Lewis H. Follett, of Angleton, W. S. Gideon and Ben B. Hunt, both of Austin, J. B. McEntire, of Dallas, Phillips, Trammell, Edwards, Estes & Orn, of Ft. Worth, J. W. Timmins, of Dallas, J. A. Rauhut, of Austin, R. A. Weinert, of Seguin, Fouts, Amerman & Moore and R. E. Seagler, all of Houston, and Jas. A. King and J. F. Hair, both of Austin (E. E. Townes and John E. Green, both of Houston, and T. L. Foster, of Dallas, of counsel), for appellants.

Gerald C. Mann, Atty. Gen., and Robert E. Kepke, Asst. Atty. Gen., for the State.

H. Grady Chandler and Henry H. Brooks, both of Austin, C. W. Trueheart, of San Antonio, and Cantey, Hanger, McMahon, McKnight & Johnson, Mark McMahon, Warren Scarbrough, and Gillis A. Johnson, all of Ft. Worth, for other appellees.

McCLENDON, Chief Justice.

This is a vacancy suit brought by the State to recover a strip of land in the East Texas Oil Field. It involves the true location of the west line of the Thomas J. Martin and Meredith McCabe surveys in Rusk County. As described in the State's petition the land consists of two contiguous tracts lying between the asserted west line of the Martin and McCabe on the east and the east line of the Whiteman, Wiggins, Ellington, and John Smith surveys on the west; tract No. 1 lying west of the Martin and tract No. 2 lying west of the McCabe.

The defendants, who are quite numerous, deraign their several asserted titles (some to the fee and others to mineral leaseholds) under the Martin and McCabe grants. Bryant and Groneman, cross-acting defendants, claim under mineral leases awarded them by the Land Commissioner, that of Bryant covering Tract No. 1, and that of Groneman Tract No. 2.

The trial was to a jury; and the judgment was upon a directed verdict. Under it the State recovered the land subject to the mineral leases of Bryant and Groneman; and the State, Bryant, and Groneman (each severally) recovered of the operating lessee defendants respectively large sums of money representing the value of oil produced from the land, less production and operation costs. Defendants have appealed.

■ Since the paramount issue involves the correctness of the directed verdict, and therefore requires consideration from the viewpoint most favorable to defendants of all the evidence of probative value whether actually admitted or proffered and erroneously excluded or limited, we present what we regard as a fair analysis of the evidence bearing upon this issue, without reference to the trial court's ruling thereon. The record is one of unusual length, and it will not be practical, nor do we think desirable, to go very extensively into the details of testimony and other evidence, but only to present what we deem an accurate picture illustrative of the controlling factual deductions therefrom supported by competent evidence.

The Martin and McCabe were surveyed on the same day, August 5, 1848, by J. N. Brown, District Surveyor of Rusk District, whose manifest purpose, as we shall later demonstrate, was to include in the two surveys the area embraced in the abandoned Avilla (sometimes called the Douglas) survey, which was 5,000 varas square according to the field note calls. It (the Avilla) was bounded on the east by the Daniel Clark; and surveys junior to it had been located by J. N. Brown so as ostensibly (that is according to their calls for adjoinder) to occupy the entire areas abutting on its north, west, and south lines; thereby apparently leaving no vacant land contiguous to it.

The following plat, compiled from two of defendants' exhibits with the addition of the dotted line from X to 7A and the lettering 7A, Y and Z, will facilitate a ready understanding of the situation presented for solution. The land in suit is roughly outlined by the points 7, 7A, Y and Z. The following explanation, however, should be given at this time. Point 7, as the S. W. corner of the Sims, is the location of appellants' surveyor. Appellees do not accept that location. We shall discuss this issue later. The actual ground location of point 7A is approximately 5050 varas N. of point 36 or 50 varas in excess of the combined west line calls of the Martin and McCabe. The division line between the Martin and McCabe fixed by points 43–44 is also the location of appellants' surveyor, point 43 being located by him as at point 28, the

Wiggins S. E. corner. As we shall hereafter show, we find no factual basis for this location. At this time it should be noted that this location would reduce the west line of the Martin 102 varas under its called length (3533 — 3431 = 102); and increase the length of the west line of the McCabe over its called length 152 varas (1467+152 = 1619). Other points of difference will be noted where deemed material.

DEFENDANTS' EXHIBIT No. 7-A

The several surveys shown by the plat were made by the following surveyors and on the following dates:

By Vansickle, District Surveyor: the Daniel Clark, probably at the same time as the Avilla as it calls for the Avilla, and the Avilla calls for it; the Avilla, August, 1839; the Robt. W. Smith (320–a), October 4, 1839; the Robt. W. Smith (640–a), November 3, 1849.

By David B. Brown, Deputy Surveyor: the Elliott, September 19, 1844; the Cooke and Killen, September 20, 1844.

By J. N. Brown: the Ellington, John Smith and Wiggins, July 7, 1845 (field notes of Wiggins though dated September 20, 1844, call for the Ellington); the Scott, Melton and Berry, July 9, 1845; the Sims and Snow, November 15, 1845; the Grace and Cooper, November 16, 1845; the Miller and Wiggins (40–a), July 27, 1847; the Martin and McCabe, August 5, 1848.

The Whiteman was resurveyed by Wadsworth in 1853.

The approximate location of the S. W. corner of the Clark, which is also the S. E. corner of the Avilla (point 17), is established without substantial dispute. This point is approximately 5,000 varas east of the N. W. corner of the Melton (point 36). This latter corner, according to the original field note and patent calls of the Melton, was witnessed by two trees: "A Red Oak 18 In diam Bears S 21-1/2 W 4-6/10 vs dist A Red Oak 28 In diam Bears N 26 E 6-6/10 vs dis" One of these trees was still standing at the time of the trial. Its identity and that of the location of the other tree were established by conclusive proof. The evidence is quite convincing, if not in fact conclusive, that these bearing trees were also the bearing trees of the Avilla S. W. corner described as "a post from which a tree 30 In in diam. B N 7 E 7 vs dist Red Oak 18 In diam S 54 W 5-8/10 vs dist." It was conceded that by placing the Avilla S. W. corner about 3 varas from the Melton N. W. corner the bearing trees for the Melton would fit with reasonable accuracy both as to description and location those of the Avilla. There was other strongly corroborating evidence of this location, particularly a passing call in the Avilla W. line for a spring branch at 843.2 vs. from its S. W. corner which accords with the ground location of a spring branch 845 vs. N. of point 36. Furthermore there is no evidence of an original corner at or near point 9, the spring branch passing call does not fit that location, and there is no evidence of substance which would locate the Avilla as far west as point 9 other than the calls in the Ellington and Wiggins for the Avilla west line and the Wiggins and Sims for the Avilla N. W. corner— calls which we shall later discuss.

J. N. Brown's first work in this area was locating the Ellington and John Smith on July 7, 1845, and (probably on the same day) the Wiggins. The location of the E. line of these surveys is established without substantial dispute. The Ellington calls to begin on the E. line of the Killen. Its S. and E. line calls read: "Thence East 1044 vs to post on an West boundary line of Julian de Arilla league survey (2 bearing trees described) Thence North with Said line 1730 vs to post from which A Red Oak 20 In diam Bears S 62-1/2 W 19-8/10 vs dis A Red Oak 24 In diam Bears N 21 W 14 vs dis". The John Smith begins for its N. E. corner at the Ellington S. E. corner describing identical witness trees. Its next call is south but it does not call for the Avilla. The Wiggins calls to begin at the N. E. corner of the "Ellington Survey on the West boundary of Julian de Avillas League (describing identical witness trees) Thence North on Sd line 1490 vs to the N W corner of Sd league and S E corner of School League No. 1." No record was found of this school league, and that particular reference may be disregarded.

Next in order Brown laid out the Scott, Melton and Berry on July 9, 1845. The Berry begins on the W. line of the Melton 413 vs. N. of its S. W. corner. It proceeds thence W. 2144 vs. N. 1685 vs. to the S. W. corner of McCarty; thence E. 800 vs. S. E. corner of "Same and S. W. corner John Smiths Survey continuing East at 2144 vs S E corner of same and N W corner of Anna Melton Survey"; thence south 1685 vs to beginning. It is quite manifest that Brown did not actually survey the W., N., and E. lines of the Berry, but made the calls for those lines by projection. This is apparent from his call for the N. E. corner of the Berry at the S. E. corner of the Smith (point 8) and N. W. corner of the Melton (point 36). This demonstrates that Brown was mistaken as to the relative ground positions of the Smith S. E. and the Melton N. W. corners; that he believed those corners were at the same place, and believed that the E. line of the Ellington and Wiggins (which he called to lie along

the W. line of the Avilla) was a projection north of the W. line of the Melton. In connection with his work on the Melton and Berry on July 9, 1845, Brown filed a plat giving his conception of the identity of the Smith S. E. and Melton N. W. corners, and of the Avilla W. line as extending north from this point. The Land Office map of 1846 (no doubt compiled in this respect from Brown's work on the W., N. and E. lines of the Avilla) shows the Melton, "Arilla", Sims and R. W. Smith (640a) W. lines and the Berry, John Smith, Ellington, Wiggins and Elliott E. lines as constituting one continuous north-south line.

Brown next located the Sims and Snow, November 15, 1845, and the following day the Grace and Cooper. The Sims was constructed on the R. W. Smith (640a). It began on the Smith S. boundary line, 45 vs. W. of its S. E. corner. The calls from thence are S. "1995 vs to post on the north Boundary line of a League Survey Known as the Douglass league * * * Thence West with said line 1855 vs to N W corner of same on mound from which a Red Oak 20 In diam Bears S 25 W 4-2/10 vs dis. A Red Oak 24 In diam Bears N 11 W 8-6/10 vs dis." (It should be noted at this point that the description given in the Avilla field notes for its N. W. corner reads: "a post from which no witness but was a mound made around the post.") "Thence North 1995 vs to the S W cor of R. W. Smiths Survey * * * Thence East with South Boundary line of said survey 1855 vs" to the beginning. Each of the corners of the Sims was witnessed by bearing trees that have long since disappeared. The Grace calls to begin at Avilla N. E. corner and calls at that point for two witness trees that fit the description of those at the Avilla except as to diameter, the Avilla giving 30 inches to each and the Grace 24 inches each. The course and distance of one of these trees are substantially the same as in the Avilla ("S 30 W 6-2/10 vs") and Grace ("S 33 W 6 vs"). The other tree, a Black Oak, is located in the Grace "N 58 W 14 vs", whereas in the Avilla it is given an impossible location "E 1 W 33-8/10 vs." The next call is "West with Sd Avilla League 905 vs." The Cooper begins "at the S. W. corner of Thos Graces Survey on the North Boundary of Julian de Avillas League." Its S. W. corner is a "post on North Boundary of Julian de Avilla League, * * * Thence East

on Sd Survey 734 vs to the Beginning." The Snow begins at the S. W. corner of the Cooper. Its N. W. corner is the Sims N. E. corner; Thence S. "with Sd Survey 1995 vs to its S. E. corner on North boundary of Julian de Avilla's league Thence East on Sd line 1527 vs to Beginning corner." It will thus be seen that each of these four surveys of Brown calls for the North line of the Avilla and one (Grace) calls for its N. E. corner and another (Sims) for its N. W. corner. The combined called length of the South lines of these four surveys is 5021 varas.

Brown's final work contiguous to the Avilla was to locate the Miller and Wiggins (40a), July 27, 1847. Each of these calls for the S. line of the Avilla; and the Wiggins extends 55 varas E. of the Clark S. W. corner. The called combined north lines of the Melton (1666.6), Scott (1666.6), Miller (1523), and Wiggins to the Clark S. E. corner (200—55=145) is 5001.2 vs.

December 3, 1847, Brown filed a plat showing his work N. and S. of the Avilla, which gave the west lines of the R. W. Smith (640a), Sims, Avilla and Melton as one continuous north-south line. Nothing to the west of this line is shown in this plat.

This was the situation on August 5, 1848, when Brown located the Martin and McCabe. The Martin certificate called for 2/3 of a league and one labor and that of the McCabe for 1/3 of a league. The two certificates therefore called for one labor in excess of a league; the Avilla for one league. Brown gave to the Martin its full quota and to the McCabe one labor under its full quota. The field note calls in the Martin read:

"Beginning at a post from which a Red Oak 24 in diam Bears S. 83 W 12 vs dist. A Red Oak 20 in diam Bears North 8 vs dist.

"Thence West 5000 vs a stake from which a Blk Jack 12 in diam Bears N. 45 W. 9 vs dist a Blk Jack 14 in diam Bears N. 16 W 12 vs dist.

"Thence South 3533 vs to a post from which a Red Oak 18 In diam Bears S 24-1/2 W 4-6/10 vs dist A Red Oak 28 In diam Bears N 26 E 6-6/10 vs dist.

"Thence East 5000 vs to the S. W. corner of the Daniel Clark's league on Toweskie Creek.

"Thence North 3533 vs to the place of beginning."

Those of the McCabe read:

"Beginning at the N. E. corner of a survey of 2/3, of League and Labor made for Thomas J. Martin, on the West B. line of the Daniel Clarks League at a post from which a Red Oak 24 In diam Bears S. 83 W. 12 vs dist. A Red Oak 20 in diam Bears North 8 vs dist.

"Thence West 5000 vs to a post (N.W. corner of Martins Survey) from which a Blk Jack 12 in diam Bears N. 45 W. 9 vs dist. (A Blk Jack 14 in diam Bears N. 16 W. 12 vs dist.)

"Thence North 1467 vs to W. W. Sims S. W. corner from which a Red Oak 20 In diam Bears S 25 W 4-2/10 vs dist A Red Oak 24 In diam Bears N 11 W 8-6/10 vs dist.

"Thence East 5000 vs to a post from which a Blk Oak 24 in diam Bears N. 38 W. 15 vs dist. A Red Oak 26 in diam Bears S 32 W 7 vs dist.

"Thence South 1467 vs to the place of beginning."

It is quite evident that Brown thought that the Avilla was 5000 varas square as per its calls, and that there was no vacant land contiguous to it. This follows from: his call in the Berry for identity of the John Smith S. E. (point 8) and Melton N. W. (point 36) corners; his calls in the Ellington and Wiggins for the Avilla W. line and in the Wiggins and Sims for the Avilla N. W. corner; his 1845 plat showing identity of point 8 with point 36; and his December 3, 1847, plat showing the Melton, Avilla and Sims W. line to be a continuous north-south line. Appellees contend that the fact that this later plat does not show the John Smith, Ellington and Wiggins as abutting on the Avilla W. line, evidences that Brown had at that time discovered that his adjoiner calls in these surveys for the Avilla were mistakes. We cannot accept this conclusion in the face of his leaving an unsurveyed balance of one labor in the McCabe certificate; since it is not reasonable to suppose that he then knew there was vacant land west of the Avilla from which he might have supplied this deficiency. His total omission of the surveys west of the Avilla from his December, 1847, plat must be explained upon some hypothesis other than that of discovery of his mistake in calls for the Avilla west line. No doubt he showed all he wished at the time to show by the plat, which included his work on the north and south lines of the Avilla, and was made just five months after his last work on those lines (Miller and little Wiggins, July 27, 1847) and eight months before he located the Martin and McCabe.

Brown's manifest objective on August 5, 1848, was to divide the supposed 5000-vara sq. Avilla area between the two certificates, giving to the Martin its full quota 2/3 plus 1/25 of the area (placing this in the south) and to the McCabe 1/3 minus 1/25 of the area. This would give to the Martin a width of 3533-1/3 varas and to the McCabe 1466-2/3 varas. He discarded the fractions, giving the Martin 3533 varas and the McCabe 1467. Necessarily, after making this simple mathematical calculation, his first step (an essential one) was to fix the east and west termini of the division line between the two surveys. This he did, and marked those corners, each by two witness trees, both of which corners, each with identical witness trees, are called for in each of the two surveys. The call for the Martin S. W. corner is for two trees which are described identically as those at the Melton N. W. corner (point 36), except that the southern tree is located in the Melton at S. 21-1/2 W., and in the Martin at S. 24-1/2 W., a nonsubstantial variance. We think there can be no question but that this call of the Martin was for the N. W. Melton (established at point 36), although the Martin does not expressly mention the Melton. On the other hand, the McCabe calls at its N. W. corner expressly for the Sims S. W. corner, with witness trees of identical location and description. There is a great deal of controversy over the true location of the Sims S. W. corner. As stated, all the original bearing trees have long since disappeared. Appellants' surveyor's location at point 7 is predicted primarily upon course and distance calls from the R. W. Smith (640a) N. E. corner with slight allowances made for property lines of long standing recognition. Appellees do not accept this location of the Smith N. E. corner. But we think the evidence sufficient factually, if not in fact conclusively, to support that location. We also think the evidence sufficient, factually if not conclusively, to establish the Sims S. W. corner as a projection north of the Wiggins S. E. corner. The northing of the Sims S. W. corner is of less importance than its westing as regards the case at bar. In the ultimate conclusion we have reached the true location of the Sims S. W. corner is not controlling; and we therefore deem it unnecessary to detail and analyze the vast volume of

evidence relied upon by the parties as supporting their respective contentions. For our purposes we will assume the point 7 location (or in any event a location with that westing) as having at least factual support. The conclusion from these premises is inescapable that one of these calls—the Martin S. W. for the Melton N. W. or the McCabe N. W. for the Sims S. W.—must be disregarded on the theory of mistake. The Martin N. W. and McCabe's S. W. corners cannot be located at different points under any tenable theory. True, the two surveys were made for different individuals. But they were made on the same day by the same surveyor; and it is not conceivable that Brown located the McCabe S. W. other than at the Martin N. W. corner. Whatever method he may have otherwise adopted in constructing the two surveys, it is certain that he was actually at the Martin and McCabe common corners and actually marked the trees he described as witnessing those corners. It is therefore apparent that the actual location of the point marked by him for the western extremity of the Martin-McCabe common line is of paramount importance in locating the western lines of these two surveys.

■ It is the contention of appellees, and the manifest conclusion of the trial court, that the call in the Martin for the N. W. Melton witness trees fixed as a matter of law at that location the Martin S. W. corner, and necessarily therefore the location of the Martin and McCabe west lines. This is predicated upon application of the well-established general rule that extraneous evidence will not be admitted to contradict or produce a conflict in the calls in a grant; the contention being (1) that the McCabe is junior to the Martin since it calls for the Martin and the Martin does not call for it; and (2) that there is no evidence of probative value that would fix the location of the Martin N. W. corner other than the call in the Martin for course and distance from that corner to the established Martin S. W. corner. If the second contention be correct, then we think independently of the first the Melton call must control for the reason that even if the two inconsistent calls were in the same grant, the fact that the Melton call accords with the distance call for the division line and the Sims call does not, should resolve the dilemma in favor of the former, in the absence of any other evidence tending to show that the Melton and not the Sims call was a mistake.

■ Before considering the evidence claimed to support the Sims over the Melton call we will note some of the circumstances surrounding the location of these two surveys and the details thereof as recorded in their field notes, asserted by one or the other of the parties as having evidentiary bearing upon the controversy. First to be noted is the fact that Brown did the entire work on the two surveys in one day. This would require surveying over sixteen miles, if he actually surveyed each of the lines in each of the surveys in accordance with their field note calls. It is reasonably certain that he did not survey the division line in locating the McCabe after he had, on the same day, surveyed that line for the Martin. Eliminating a resurvey of this line there would still be left over 13 miles of surveying if he surveyed all the other lines of each survey. It is not probable that he did actually survey all those lines. It is a matter of common knowledge that in the early years of the Republic's and State's development, when land values were very low, and the cost of surveying relatively thereto very high, surveyors often avoided what appeared to be unnecessary labor, and called for lines and corners by projection when this method could safely be used to produce reasonably accurate results. This fact probably accounts for a great many of the errors in early surveying which have been such a fruitful source of litigation in after years when the lands involved had become more valuable. That Brown was not averse to this practice is evidenced by the already noted fact of his call in the Berry for the John Smith S. E. at the Melton N. W. corner. There are a number of omissions in the Martin and McCabe field notes which, if they have any significance, seem to point to the use of the protraction method in part. The beginning corner in the Martin is not located by that call other than by the two witness trees. If that was the beginning point of Brown's work it was necessary for him to locate that point either from the S. W. Clark corner or from the N. E. Avilla corner or both. In which event the probable and natural thing for him to have done was to state this relation at the outset in his field notes. In his call for the western end of the division line, and for the lines extending south and north from that point he did

not relate that point or those lines either to the W. line or W. corners of the Avilla, or to the E. lines or E. corners of the Wiggins, Ellington, or John Smith, whereas it is evident that he believed that this point was on the W. Aville which he believed to be coincident with the E. John Smith-Ellington-Wiggins. He did not call for the N. W. Melton, although calling for the witness trees that marked it. He called for the Sims S. W. corner and for its identical witness trees; but he did not call for the N. W. Avilla at that point. He did not call for the Avilla N. line or the S. line of any of the surveys he had made to adjoin that line. Neither did he call for the Avilla N. E. or Grace S. E. corner, although calling for one of the witness trees of the Avilla and Grace; and another witness tree of identical description and distance in the Grace, but 20 degrees off course. Nor did he call for the W. line of the Clark; but it is to be noted that in his initial McCabe call he began at the Martin N. E. "on the West B. line of the Daniel Clarks League," whereas call for this same initial point in the Martin makes no reference to the Clark or any other survey. It is no more persuasive that Brown did not believe or doubted that he was on the Smith-Ellington-Wiggins E. line because he did not mention those lines, than that he did not believe or doubted that he was at the Melton N. W. corner because he did not mention that corner. His failure to call for any of the lines or corners mentioned is readily explained by the fact of his assumed familiarity with the relative ground positions of those lines and corners, and inclusion in his field notes only what he thought essential to delineate the two surveys; just as, in all probability, he economized in his actual work of surveying, doing only what he thought necessary, and writing up the field notes later from this actual work on the ground, regardless of where he actually began or ended.

In 1931, in a letter tentatively denying a vacancy west of the Martin and McCabe, Mr. Walker, then Land Commissioner, a man of unusually wide experience in interpreting early Texas surveys, wrote: "In the light of the record, I am deeply impressed with the thought that in the location of the McCabe and Martin, Mr. Brown ran but one line, and at the utmost two lines. The only lines necessary to be run, and it occurs to me the line he would have been compelled to run to divide the area between the two certificates, was to begin at the SW corner of the Sims and run S to mark the corner between the McCabe and Martin. From that point a line E to the W line of the Clark would have been all the surveying required."

We have the highest respect for Mr. Walker's views and conclusions upon a matter in this field; but we cannot regard the statement as having any factual probative significance. It was professedly based solely upon the Land Office records, the same records that are now before us for interpretation—which interpretation we think is a question purely of law. If the statement be considered as an official act of the Commissioner and as such prima facie evidence of no vacancy; it would lose its evidentiary value when the entire record upon which it was predicated was revealed. Furthermore, any prima facie evidentiary value it may originally have had would be nullified by the act of his successor in approving the applications of appellee lessees.

That set out above constitutes, we think, the substance of all the evidence bearing upon the controversy up to and including the time Brown made his survey of the Martin and McCabe.

We will now consider the evidence which appellants contend shows (factually, in any event, if not conclusively) that the west extremity of the division line between the Martin and McCabe must be located from the Sims S. W. corner, and the call for the Melton N. W. witness trees must consequently be rejected as a mistake. This evidence consists in (1) recitals in subsequent surveys and deeds; (2) uniform recognition by owners in the Martin and McCabe extending back to very early times; (3) general reputation in the community for a like period; (4) Land Office maps.

On November 10, 1851, Hollingsworth, deputy district surveyor, surveyed the Barnett, called to begin at the Melton N. W. corner with witness trees identical in location and description with those of the Melton and Martin, except as to the course of the southern tree "S 24 W," in the Melton S 21-1/2 W. and in the Martin S 24-1/2 W. "Thence West 160 vrs to S. W. corner of Martin Survey at a set post." Thence N. 290 vs to S. E. corner of John Smith Survey describing witness trees identical as to description and location with those of the Smith S. E. corner.

Thence W., etc. This survey was rejected. The Land Office wrapper has a notation, dated "Nov. 16/52", stating that it "covers Geo. Berry's 640 acre survey." Below the certificates of Hollingsworth and the district surveyor to these field notes, the following appears: "These field notes do not show the Martin Survey and the Ann Melton to corner together owing to the west line of said survey of Martins not being run until it was run by other surveys and it does not close by 160 vrs. Benj. P. Hollingsworth Dep. S.D.R."

Patent to the Martin was issued December 30, 1851, which was 50 days after the Barnett was surveyed, and 33 days after the district surveyor certified the Barnett field notes. Appellees contend that the subsequent issuance of patent to the Martin with the Melton N. W. trees described therein, indicates that the Land Office regarded the N. W. Melton call as correct, regardless of information in the Barnett field notes then on file in the Land Office. The record does not show when the Barnett field notes were filed in the Land Office; but the fact that the file does not appear to have been acted upon until November 16, 1852, would indicate that the Land Office officials charged with the duty of approving surveys for issuance of patents were not apprized of the information contained in the Barnett field notes regarding the Martin until after that survey had been approved and patented.

The Barnett field notes were admitted by the court, but the jury were directed not to consider them as bearing upon the location of the Martin. The quoted notation after the certificates was excluded altogether.

One objection of appellees to the Barnett field notes was to the effect that they did not constitute an archive of the Land Office because the attempt of Hollingsworth to locate the Barnett on top of the Berry was illegal and therefore his work in connection therewith was not a part of his official duties. This objection is not well taken. Hollingsworth was clearly acting within the scope of his official duties when he attempted to locate the Barnett certificate. The fact that his work was ineffectual on account of previous appropriation of the land did not make it any the less official. The field notes were clearly admissible to the extent of their recitals of what Hollingsworth actually found on the ground. The same rule, we think, applies to the notation. Clearly the field notes were admissible to show the relative ground positions of the Smith S. E. and Melton N. W. corners (which Brown had described in the Berry as identical). The notation explaining why Hollingsworth placed the Martin S. W. S. of the Smith S. E. corner, constitutes a factual declaration that there was no evidence of the witness trees called for in the Martin at that point, and that the Martin call was for the Melton witness trees. There is no factual statement as to the basis for placing the Martin S. W. S. of the Smith S. E. corner or as to where Brown actually located the Martin N. W. corner. The Barnett field notes do place upon the public records as early as 1851 the assertion of a deputy district surveyor of evidence actually found on the ground to the effect that the S. W. corner call in the Martin is for the Melton N. W. corner, which corner was 160 varas E. and 290 varas S. of the Smith S. E.; and a conclusion that the Martin call for the Melton was incorrect.

May 23, 1851, Hollingsworth (not the surveyor of the Barnett) conveyed to Dunn 555 acres out of the McCabe "and in the N. W. corner of said one-third of a league", described to begin 45 vs. E. of the Sims S. E. cor., thence S. 1585 vs., thence W. 1900 vs. "to the S. E. corner of Survey of 320 acres in the name of H. L. Wiggins," thence N. 1585 vs. "to the S. W. corner of said Sims Survey." It is to be observed that no bearings are given for any of these corners. July 26, 1853, Hollingsworth conveyed 57-1/20 acres to Hicks, called to begin at the Dunn S. W. corner, "the same being the N. W. corner of the Thomas J. Martin Survey at a stake from which a black oak 18 in. brs. S. 66 W. a blk. oak 24 in. brs. N. 30 W.; Thence South with the W. line of said Martin Survey 495 yrds. a post on the bank of a branch course W. a sweet gum and dogwood are bearing trees"; thence E., etc. March 24, 1856, Hollingsworth conveyed to Watkins 365 acres which included the Hicks 57-1/20 acres. The second call N. from its S. E. corner was for a point on the Dunn S. line "Thence E. (should be W.) 1238 vrs. to a stake from which 2 red oaks 18 in in dia are bearing trees on the west line of the T. J. Martin survey 2/3 of a league." Thence S., etc. March 11, 1856, Hollingsworth sold to Jos. Box 966-1/2 acres which began at Salina Box S. W. corner thence N. 875 vrs.; thence W. 966-1/2 vs.; thence S. 875 vs.

"to corner, the South East (should be S. W.) corner of the Thomas J. Martin 2/3 of a league survey"; thence E., etc. The evidence was sufficient factually (if not in fact conclusively) to establish the west lines of these four conveyances on the ground as coincident with the east line of the Wiggins, Ellington and John Smith; and possession of those tracts up to that line extending back some seventy or eighty years. In connection with these deeds and the chains of title thereunder, appellants offered certificates of the Comptroller's Department showing rendition and payment of taxes by the several present claimants and their predecessors in title from the time of the original subdivision deeds. These receipts and certificates do not identify the land other than to give the names of the owners, the surveys in which located, and the acreage.

There was also offered evidence to the effect that by general reputation in the community the Martin and McCabe W. line coincided with the Wiggins, Ellington, and John Smith; also field notes of a school district division line established by order of the Rusk County Commissioners Court in 1896, which called for the N. W. corner of the Melton, "Thence West to the S. W. corner of said Martin Survey; Thence North with the W. line of said Martin Survey to the S. W. corner of the M. McCabe Survey and continuing N. with West line of said survey to N. E. corner of H. Higgins Survey; Thence West," etc. In 1904 the minutes of the Commissioners' Court gave similar calls to a school district division line. The record amply supports a finding that there has been uniform recognition of the location of the Martin and McCabe west lines as coincident with the Wiggins, Ellington and John Smith east lines. We think it unnecessary to set it out more in detail.

As already stated, the Land Office map of 1846 shows the R. W. Smith, Sims, Avilla and Melton W. lines as constituting a continuous north-south line, and as coincident with the John Smith, Ellington, Whiteman, and Elliott E. lines. The Martin and McCabe are also shown on this map as covering the same area as the Avilla. These latter surveys were evidently platted in after the map was dated, as they were not made until 1848. The maps of 1861 and subsequently up to 1932, give the correct relative positions of the Melton

N. W. and John Smith S. E. corners; but extend the Martin and McCabe west of the Melton to the John Smith-Ellington-Wiggins E. lines, and place the Sims W. line as a projection north of that line. There is no evidence from which it could be deduced that these maps were compiled from any other data than that afforded by the work of surveyors evidenced by field notes and reports filed in the Land Office. As such they constitute interpretations placed by the Land Office officials upon these records. The 1846 map was no doubt constructed from field notes and reports of Brown in his work on the north, west and south lines of the Avilla, and his calls for adjoinder therein. This map does indicate that the John Smith does not extend as far south as the Melton, due no doubt to the deficiency in combined distance calls for the John Smith, Ellington, and Wiggins E. lines. The 1861 map was no doubt compiled from the same data as the 1846 map with the addition of the work of Hollingsworth on the Barnett, which showed the relative positions on the ground of the John Smith S. E. and the Melton N. W. The fact that the map extended the Martin-McCabe W. line to this new location of the Sims W. and John Smith-Ellington-Wiggins E. lines has no other factual basis so far as the Land Office records are concerned than the call in the McCabe for the Sims S. W. and the explanation of Hollingsworth in the Barnett. The same may be said of subsequent maps.

We have reached the conclusion that under the adjudicated cases the evidence admitted and proffered was insufficient to overturn the call in the Martin for its S. W. corner at the point marked by the bearing trees for the N. W. Melton; and that the call in the McCabe for the S. W. corner of the Sims must be rejected on the ground of mistake. This conclusion is based upon the following considerations:

Whatever method Brown may have employed in laying out these two surveys it is certain that he was at and marked (each with two bearing trees) the common east and west termini of their division line. Under no tenable theory can the north line of the Martin, including its western terminus, be separated from the McCabe south line, including its western terminus. The McCabe S. W. cannot be extended westward from the Martin N. W. As already stated the actual location on the

ground of the point at the western terminus of the division line where Brown marked the two bearing trees for this point would control the location of the Martin and McCabe west lines. But, as we shall presently see, there was in our opinion no probative evidence of the actual location on the ground of the bearing trees for this point. Consequently the call in the Martin for N. W. bearing trees of the Melton must control the location of this point. This for two reasons: (1) Brown made the Martin senior to the McCabe by his field note calls which first laid out the Martin and built the McCabe on it; (2) the 5,000-vara call for the western terminus fits, with practical exactness, a northern extension of the Melton W. line. To extend the division line to a point S. of the Sims S. W. corner would give it an excess of some 180 varas.

We will now give our analysis of the above evidence as regards its probative effect in locating on the ground the Martin-McCabe common western corner as marked by the two witness trees Brown described in his field notes.

■ As to the Barnett field notes: Hollingsworth made no statement that he found the Martin N. W. corner on the ground. He did actually locate the Melton N. W. and John Smith S. E. on the ground and showed the relative positions of those two points. He found no S. W. corner of the Martin south of the John Smith S. E., and explained his locating it there: "owing to the west line of said survey of Martins not being run until it was run by other surveys and it does not close by 160 varas." What other surveys? We are left only to surmise. There were no other surveys after the Martin and before the Barnett, so far as the record discloses. This location of the Martin S. W., south of the John Smith S. E., has no factual basis in the Barnett recitals. It is as readily referable to the call in the McCabe for the Sims S. W. as to any other fact. In the absence of any affirmative recital in the Barnett notes to the effect that Hollingsworth actually located the point where Brown marked the bearings for the Martin N. W., we cannot accept the Barnett recitals as constituting any probative evidence of the Martin S. W. location 160 varas west of the Melton N. W.

The calls in the four Hollingsworth subdivision deeds are equally silent as to a N. W. Martin—S. W. McCabe, with bearings corresponding to those marked by Brown. The first of these deeds (Dunn 555 acres) described the tract as in the N. W. corner of the McCabe. No bearings for any corners were given but the N. W. corner call was for the McCabe N. W. The Martin was not mentioned. The S. W. corner call was for the Wiggins S. E. The east and west lines called for 1585 vrs. The actual ground distance from the Wiggins S. E. to point 7 is 1620 varas. As we have already seen, the ground location of the Wiggins S. E. is only 3431 varas north of the Melton N. W., or 102 varas short of the called length of the Martin W. line; and there is no factual basis for placing the Martin N. W. at the Wiggins S. E. The Dunn does not purport, by call or otherwise, to locate any line or corner of the Martin, nor the S. line or S. W. corner of the McCabe. It does place the Sims S. W. due north of the Wiggins S. E. The location of McCabe N. W. at the Sims S. W. is readily explainable by the call in the McCabe for that corner. The Dunn deed recitals throw no light upon the inquiry where Brown actually placed the Martin N. W.—McCabe S. E. on the ground. This deed was executed less than three years after Brown located the Martin and McCabe. A little over two years later (July, 1853) Hollingsworth conveyed the Hicks 57-1/20-acre tract. The beginning call was for the Dunn S. W. corner, referred to as being the same as the Martin N. W. (in the Dunn it is described as the Wiggins S. E.) and designates two black oak bearing trees, giving their courses and sizes, but not their distance. Of course, the relative position of any two points (trees) can be made to fit course calls from any other point (corner), excluding parallel or identical calls and excluding calls one of which would pass through both points. In the present instance, if we were to assume that the Hicks trees were in fact those of the Martin, the Hicks corner would be located by its course calls for these trees N. 9° 33' W. of the Martin corner. But there are insurmountable obstacles in the way of this assumption. The trees were of the same kind—black jack in the Martin and black oak in the Hicks. But here the analogy ends. The sizes of the trees do not nearly correspond. One Martin tree was 14 inches; the corresponding Hicks tree was 24 inches; the other Martin 12 inches and the Hicks 18 inches. The Hicks was surveyed a little less than five

years after the Martin. The witness trees in the two surveys cannot be made to correspond with any reasonable degree of accuracy. Furthermore, if they had otherwise corresponded, their respective courses from the Hicks corner would as stated place that corner 8.66 varas North and 9° 33' west of the Martin. It is hardly probable that the owner of the McCabe would have thus mistaken the location of its S. W. corner with reference to its witness trees. A much more probable and plausible theory is that he confused the Martin N. W. with the Wiggins S. E. corner, and mistook the latter's bearing trees for those of the former. This is a reasonable deduction from the call for the Dunn S. W. at the Wiggins S. E., and the correspondence as to size and approximate course of the Hicks N. W. bearing trees with those of the Wiggins; and the bearing trees called for at the Watkins N. W. corner as two red oaks 18 inches in diameter, course and distance not given. The Watkins was surveyed a little less than three years after the Hicks. It is further to be noted that the Watkins N. W. called to be at a point "on the west line" of the Martin, not at its N. W. corner. The calls in these three deeds are, by every reasonable construction, for a common point at the Dunn S. W. and Hicks and Watkins N. W. corners. These corners cannot be separated. They were placed there by the same grantor approximately three, five and eight years after the Martin. They first described this point as at the Wiggins S. E. Its distance call south of the Sims point 7 location (1585 vs.) without allowance for any excess would give it a ground position 67 varas south of the Martin N. line located at its called distance from its S. W. corner (Melton N. W.) There is no basis for rejecting the Wiggins S. E. corner call in the Dunn for its S. W. corner; nor for separating the Hicks and Watkins common N. W. corner from the Dunn S. W. corner. This point (fixed in Dunn as the Wiggins S. E. corner) is given witness trees in the Hicks corresponding as to size and course location with those of the Wiggins and witness trees in the Watkins corresponding as to size and kind with those of the Wiggins. The Watkins also describes this common point as "in the west line", not at the N. W. corner of the Martin. These considerations impel rejection of the Hicks N. W. Martin call as a mistake due no doubt to confusion of the Martin N. W. with the Wiggins S. E.

There was a fourth deed executed by Hollingsworth March 11, 1856, conveying to Box 966-½ acres, which calls for the Martin S. E. (should be S. W.) corner, but there is no call for any bearings, and as already shown there were no original bearing trees at that corner if placed west of the Melton, and Brown was not at that corner in fact. It will thus be seen that the recitals in these four deeds are wanting in probative effect as locating the Martin N. W. corner at a point where Brown actually placed it on the ground and marked it by the two witness trees described by him. All of the calls for the Martin in these surveys are readily referable to the call in the McCabe for the S. W. corner of the Sims; the first (Dunn) calling for that corner, and the two succeeding deeds being based on the Dunn.

■ Nor do we think the Land Office maps constitute any probative evidence which can overturn the Martin S. W. call for the Melton N. W. And the same we think is true of the evidence of general reputation and Land Office maps as to the location of the Martin and McCabe west lines.

Our conclusion is therefore that the trial court correctly located the west line of the Martin and McCabe by projection north from the Melton N. W. corner.

We will discuss briefly the principles of law, deduced from adjudicated cases, upon which we base this conclusion.

■ The primary objective in locating a survey is to "follow the footsteps of the surveyor"; by which is meant to trace on the ground the lines as he actually ran them in making the survey. This following or retracing the surveyor's footsteps is necessarily a deduction from available evidence, since we have no means of actually following him in the flesh. Certain rules have been enunciated by the courts for evaluating evidence as to its pertinence and relative significance in attaining this objective. Of primary importance is what the surveyor himself said in his field notes with reference to where he went and what he did. Consequently when the points he has therein designated as marking the lines he actually traced can be located on the ground with certainty, and as so located present no inconsistency

or conflict, the survey must be laid. out from those points, and extraneous evidence cannot be admitted to contradict the assertion of the surveyor that he actually went to the points he so designated. In the Martin the points marking its four corners were definitely described by Brown. Two of these points, the S. E. and S. W. corners, are now fixed on the ground with certainty. As to the other two corners, the original evidence, that is the bearing trees marking them, has long since disappeared. Consequently the survey must be laid out from those two south corners, in the absence of probative evidence as to the actual ground location of the trees marking the other two corners. We have already given our analysis of the evidence contended to have bearing upon this issue, and our reasons for rejecting it as of insufficient probative value. It remains only to consider the rules of evidence upon which we base this rejection.

■ As regards the calls and recitals in junior surveys it is well established as a general rule that these cannot be admitted "to create an ambiguity in the calls of the senior survey," or "to change the location of the senior survey." See 7 Tex. Jur., p. 227, § 73, and notes 3 and 5. However, such calls and recitals may be admitted as declarations of deceased surveyors, as to what they actually found on the ground. See discussion of this subject in 7 Tex.Jur., § 71, pp. 223 et seq., and § 73, p. 226 et seq. A similar rule applies to ancient deeds. See 7 Tex.Jur. § 84, pp. 245–246. There is a great volume of adjudicated cases upon this subject. These cases have been exhaustively treated in the able briefs of the respective parties. We think it would serve no useful purpose to burden this opinion with a detailed discussion of them. We are assuming, for our present purposes, correctness of the above-stated general rules, and that thereunder the Barnett field notes and the several Hollingsworth deeds are admissible to the extent of their factual recitals. We reject them as deficient in factual recital concerning the actual location of the bearing trees of the Martin N. W.-McCabe S. W. corner, for the reasons stated in our above analysis.

■ A very clear, and we believe accurate, statement of the rule under which recitals in subdivision deeds (as well as in junior surveys) are admitted as evidence in locating the boundaries of the original grant, is the following from Taylor v. Higgins O. & F. Co., Tex.Civ.App., 2 S. W.2d 288, 301: "If in making a subdivision of an original grant the surveyor found upon the ground the natural or artificial objects called for by the original surveyor, which subsequently disappeared, and in making the subdivision he called for such original objects and made them a part of his work, tying his work to such objects, and in his work established new corners upon the original lines of the survey, such corners assume the dignity of original calls in locating the original corners and lines upon which these inside calls were based, when it is shown that the surveyor who made them is dead."

As we have shown above the recitals in none of these documents meet this test as regards the bearing trees of the Martin N. W.-McCabe S. W. corner.

■ Land Office maps do in proper cases furnish evidence of boundary locations. See 7 Tex.Jur. p. 232, § 76. But after all, such maps are but compilations by Land Office officials from records in that office, and as such are but conclusions of those officials as to the effect of the records. Where, therefore, as here, the records. are in evidence, the maps cannot be given evidentiary significance beyond that which the records warrant. This subject is very ably treated, with citation of authorities, in the case of Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259, 264, wherein it was held that "the state may not be 'mapped out' of land owned by it even though the map may be made in the state's General Land Office."

■ Reputation as to the location of boundaries is sometimes the only evidence available. "A necessity for such evidence arises from the lack of other satisfactory proof, the matter usually being an ancient one and there being no living witnesses." 7 Tex.Jur. p. 244, § 82. The evidence on this point is no more specific than that contained in the Barnett field notes, or in those of the subdivision deeds. It does not extend to the ground position of the bearing trees of the Martin-McCabe common west corner; and therefore adds nothing to the other evidence offered on this subject. All of this evidence, taken singly or in combination, is readily referable to the original McCabe call for the Sims S. W. corner, and adds nothing to the actual ground location of the Martin N. W. bear-

ing trees, beyond what might be implicit in the McCabe call for the Sims.

In Blaffer v. State, 31 S.W.2d 172, 191, this court said: "The public policy of this state, as announced in repeated decisions, demands the security of land titles emanating from the state, and, where ancient boundary lines have been recognized for long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them."

We have held this consideration firmly in mind in viewing the evidence in this case; and in reaching the above conclusions. Whatever hardships may result from these conclusions arise from the fact that the controlling issue is the true location of the original lines of the surveys as made by Brown, which issue is in turn controlled by the S. W. corner call for the Melton N. W. bearing trees, in the absence of probative evidence showing that call to be a mistake. The issue is thus confined to the inquiry whether the land actually lies within the boundaries of the original grants. The State's title is not affected by the lapse of time, laches, adverse possession or payment of taxes. It is not estopped or otherwise adversely affected by the dereliction or failure to act of its officers; nor by the declarations or acts or long recognition of others. These principles are so well established as to be now regarded as elementary. They are discussed in Weatherly v. Jackson, supra. The evidence in this case precludes resort to any question of public policy.

Appellants claiming title to tract No. 1, assign error upon the court's refusal to award them recovery of the mineral and surface rights acquired by Bryant under his lease from the State upon their pleas of the five years' statute of limitations, Vernon's Ann.Civ.St. Art. 5509. The facts upon which these pleas were based are these: July 9, 1931, Hopkins applied to the county surveyor for a survey under the Act of 1931, Vernon's Ann.Civ.St. Art. 5421c. Field notes under this application were filed in the Land Office August 26, 1931. These field notes were rejected by the Land Commissioner March 25, 1932, "for reason apparently no space for this and if there were it would be subject to preference right clause of Chapter 271, 1931 Act." Nothing further was done regarding the application until October 8, 1937, when Hopkins filed his

answer and cross-action in this suit. Meantime (February 14, 1937) the Supreme Court, in Caples v. Coles, 129 Tex. 370, 102 S.W.2d 173, 104 S.W.2d 3, held that sale of land within five miles of a producing well was forbidden by the 1931 Act. This holding eliminates the Land Commissioner's second ground of rejection of the application. Hopkins assigned his interest in the application to Bryant, who filed corrected field notes and the lease was awarded him—all on October 26, 1937. The terms of the lease were: $2 per acre cash; 25¢ per acre per annum delayed rental; ⅛ royalty and $100 per acre to be paid out of one of the remaining ⅞ of the first oil produced. December 29, 1937, Bryant filed his cross-action.

The theory of appellants is that upon the rejection of the application on March 25, 1932, the cause of action against appellants arose and became barred by the five years' statute, since it was not sued upon until the Hopkins' cross-action was filed in October, 1937—appellants having shown adverse possession and payment of taxes under recorded deeds for the statutory period.

Even were it conceded that Hopkins acquired by his application and survey rights in the mineral title which would support an action against appellants (See Hughes v. McDonald, Tex.Civ.App., 122 S.W.2d 366, 367, and authorities there cited), we are clear in the view that such action would not be a possessory one and therefore not affected by the invoked statute. Hopkins' application was for a mineral lease as a "discoverer" of unsurveyed school land under Sec. 8 of the 1931 Act which provided that after the field notes had been approved the applicant should have a preference right to purchase "a mineral lease thereon at the minimum price fixed by the Land Commissioner, in addition to the other consideration provided herein." It is manifest that all Hopkins got by his application was the preference right to purchase the lease provided for in the act. He acquired no possessory right or title to the mineral estate that would support an action in trespass to try title until the Commissioner had approved the field notes, fixed the price he was to pay, and he had accepted and complied with the prescribed terms. Until which time the mineral estate and possessory rights therein remained entirely in the State. Independently of this view, how-

ever, the issue is ruled by the case of United P. Corp. v. Hughes, Tex.Com.App., 152 S.W.2d 327, wherein it was held (overruling the holding in the Hughes case, supra) that a suit by the applicant against third parties could not be maintained, since it was in effect a suit against the State. The facts in the Hughes case are on all fours with those in this case on this point. See statement of facts of that case in 122 S.W.2d at page 369, Col. 2.

Appellants next contend that the trial court erred in allowing the State or cross-acting defendants recovery for oil produced more than two years before the commencement of their respective suits, basing these contentions on R.C.S., Arts. 7389 and 7395.

These articles are a part of our statutory title governing the action of trespass to try title; and prescribe the procedure by which the rights of the landowner to recover for use of and injury to his land on the one hand, and those of the good faith trespassing possessor to the value of his improvements on the other may be adjusted. The former provides that "damages shall not be assessed under this article * * * for injuries done [by such good faith possessor] over two years prior to the commencement of the suit"; and the latter that if the value of the improvements exceeds the damages to the land the damage done prior to the two-year period shall be resorted to "as far as may be necessary to balance the claim for improvements, but no further; and he shall not be liable for the excess, if any, beyond the value of the improvements."

▇▇▇ Appellants contend that these statutes fix the substantive rights of the possessor in good faith and are applicable to the State as well as to any other plaintiff in a trespass to try title action. Appellees contend that in the respect in question the articles are limitation statutes and do not apply to the State. They further contend that if the provisions are substantive they are unconstitutional as applied to the State. Since we concur in appellees' first contention, the second becomes immaterial and need not be considered.

The facts pertinent to these contentions are these: The appellees entered into stipulations with the several operating appellants regarding the facts with reference to the amount of oil produced, the dates,

prices received, cost of drilling and operating, etc., as bases of recovery on this phase of the case, in the event the appellees should recover the land. A further stipulation was entered into between the State, on the one hand, and Bryant and Groneman, on the other, to the effect that the State should recover 8/8 of the production up to the date of applications for lease under which Bryant (July 9, 1931) and Groneman (July 14, 1933) claimed, and 1/8 thereafter, without deduction; and that Bryant and Groneman should recover 7/8 of production after the dates of the respective applications, from which should be deducted all costs of drilling and operation without reference to when such costs accrued. Some of the operating appellants ratified this agreement; and as to them the instant issues have no application. The monetary judgment was in accordance with these stipulations.

Our conclusion that the provisions of the articles in question are limitation statutes, and do not fix substantive rights, is based upon the following considerations:

Prior to 1840 the civil law, both substantive and procedural, was in force in Texas. In 1840 the Congress adopted the common law of England as "the rule of decision." Common law procedure, however, was not adopted, but the Congress, at the same session, enacted rules of procedure in civil actions, modeled after the civil law, and created the trespass to try title action as a substitute for all common law real actions (Acts of Feb. 5, 1840, p. 136, Vernon's Ann.Civ.St. art. 7364 et seq.). Under the common law the good faith possessor could not recover for the value of improvements except by way of offset to the owner's claim for value of the use of the land. "The rule of the civil law was, however, more liberal, and permitted one who had made improvements on land in his possession, under the bona fide belief that he was the owner of it, to exact full compensation for the value of such improvements, less the value of the use of the land, before he could be compelled to surrender it. Chancery borrowed the rule of natural equity from the civil law." 27 Am.Jur., p. 262; see, also, Scott v. Mather, 14 Tex. 235; Saunders v. Wilson, 19 Tex. 194.

Sec. 8 of the 1840 Act provided for recovery by the good faith possessor of the value of his improvements. In this respect this act was but declaratory of the civil law as it existed in Texas at the time

of its enactment. To quote Chief Justice Hemphill in Scott v. Mather, above: "The law giving compensation to the possessor in good faith, for his improvements, cannot be held to have violated any contract. This was always the law. It was the law before the first title to land was issued in the now State of Texas, and it is still the law, and all titles from the Government or individuals must be held in subordination to, and under the modifications imposed by such law."

■ The only modifications of the pre-existing civil law contained in the act relate solely to matters of procedure, some of which were later held invalid. We are not concerned with these provisions here. It is to be observed that Section 8 of the Act did not specifically refer to damages to the land by the good faith possessor. It did, however, provide for offsetting the value of the "use and occupation" of the land against the value of the improvements. The act was wholly silent as to any time period within which use or occupation value was limited. The above provisions of Arts. 7389 and 7395 were first enacted in the Revised Statutes of 1879 as Arts. 4809 and 4815, being inserted therein by the codifiers. These articles have been brought forward unchanged in subsequent codifications. It seems clear to us that neither the 1840 Act nor the two above articles wrought any change in the substantive rights of landowners and good faith possessors with regard to that of the former to recover for the use of and injury to his land and of the latter for his improvements which enhanced the land's value. The 1840 Act merely carried forward the law as it existed at the time in Texas with reference to improvements, and the Revised Statutes merely recognized and carried forward the substantive rights of the parties with reference to all these subjects as they then existed in this State. The trespass to try title act was manifestly but a procedural statute. It did not purport to fix the substantive rights of the parties; but merely provided a simple action for the recovery of title and possession of lands, and the procedure under which the respective rights of the parties might be enforced in the courts. The particular wording employed in the above articles does not, we think, militate against the conclusion that the limitation of recovery for use and damages to the two-year period before suit is filed is a limitation and not a substantive right provision. Nor do we think that the fact that the two-year period is not required to be specially pleaded is important. The provisions only apply to trespass to try title actions. Gulf, C. & S. F. Ry. v. Poindexter, 70 Tex. 98, 7 S.W. 316, 324. Had the Congress or legislature ·intended to prescribe the substantive rights of landowners to recover for injuries done to their lands no tenable reason is suggested why a general statute upon the subject was not enacted which would govern in all cases regardless of the form of the action in which the right was asserted. That this is the proper construction of these provisions was clearly recognized in the following language of the Poindexter case, above: "It may be necessary to state that, in suits of trespass to try title, the general law of limitation as to injury to the estate of another does not apply. When the suit is strictly for damages to an estate or to land, the general law of limitation is applicable, but when the suit is in trespass to try title, the statute regulating such suits governs."

■ Since limitation is not available against the State the provisions in question have no application to its right of recovery for the oil extracted from the land.

■ As has already been stated, Bryant and Groneman acquired no title or interest in the oil estate until they had accepted and paid the price fixed by the Land Commissioner for their leases; which was less than two 'years before their cross-actions were filed. In so far as their recovery may be predicated upon oil extracted between the dates of their respective applications and that of their leases; it represents recovery inuring to the State to which they succeeded under the stated stipulation. The approval of that stipulation by the trial court is implicit in the judgment rendered thereon. With the wisdom or propriety of the stipulation and judgment thereon we are not here concerned. The State has not appealed; and makes no complaint. The judgment we think is clearly binding upon it. The agreement and judgment thereon in no way deleteriously affects the rights of producer appellants and they are not so situated as to complain of it.

■ Appellants assign error in awarding interest to Bryant and Groneman upon

the amounts they recovered as damages for oil extracted from the land. The point made is that the pleadings do not cover interest. The cross-actions of Bryant and Groneman were practically identical in this regard. Each alleged that by virtue of his application and lease he became vested with the title to 7/8 of the oil in place as well as that which had been or might be produced from the tract covered by his lease. The prayer (to the extent pertinent) was that he have judgment "for recovery of damages for oil and gas produced and converted from said land * * * and that he have all other and further relief, both general and special, in law or in equity, to which he may be entitled." As stated above, some of the operating appellants signed the stipulation covering the apportionment of recovery as between the State and lessees Bryant and Groneman, upon which the judgment in that regard was based. This stipulation expressly provided for interest. As to those signing this stipulation there could be no possible question as to the right to recover interest. All operating appellants signed the stipulations which showed the facts regarding extracted oil (amount, dates, costs of drilling, production, etc.). These stipulations were made for the purpose of forming the basis of recovery which might be warranted by the facts set forth in the stipulations.

Interest, not eo nomine, but as a part of the damages incident to the extraction of the oil, was recoverable as a matter of law. See Western Union Tel. Co. v. Eckhardt, Tex.Civ.App., 2 S.W.2d 505, and authorities there cited. The general rule applicable here is thus expressed in 13 Tex.Jur., p. 333, § 186: "Interest which is recoverable as damages is in the nature of general damages, and may be allowed under a prayer for general relief, without the necessity of a specific prayer therefor, provided that the amount claimed in the pleadings is laid in a sufficient sum to cover the loss at the time of the accrual of the cause of action and interest thereon from that date to the time of trial."

The pleadings did not pray for any specific sum, but for damages for oil extracted and converted and for general relief. There was no objection to the pleadings because they did not attempt to fix a sum for which recovery was sought, and therefore no complaint could be urged against recovery to the full extent that the facts (here agreed to) might warrant. Interest was an essential ingredient of the "damage" sought, and clearly we think was recoverable in the circumstances under the pleadings.

The trial court's judgment is affirmed.

Affirmed.