GILES, Commissioner of the General Land Office et al. v. KRETZMEIER et al.

No. 2937.

Court of Civil Appeals of Texas. Waco.

April 26, 1951.

Rehearing Denied May 24, 1951.

Price Daniel, Atty. Gen., Robert W. Spence, Ben H. Rice III, and Mary K. Wall, Asst. Attys. Gen., for appellants.

Wm. B. Moss, Sinton, Keys & Holt, Corpus Christi, Kelso, Locke & King, San Antonio, Roy C. Ledbetter, and Walace Hawkins, Dallas, Scott Gaines, Austin, for appellees.

LESTER, Justice.

The nature of this case as set out by appellants, which the appellees say is correct with certain deductions, is as follows:

This is a vacancy case filed in the District Court of San Patricio County by the Magnolia Petroleum Company, as the mineral lessee, joined by the royalty and surface claimants, in the form of a trespass to try title to a strip of land 84 varas wide, containing 26.93 acres, more or less, located in the county. Defendants are A. C. Strawn of Travis County, who had applied to lease the land from the State of Texas; Bascom Giles, as Commissioner of the General Land Office of Texas; Price Daniel, as Attorney General of Texas; and certain other parties who were made parties for the record but who do not claim adversely to plaintiffs.

The land claimed to be vacant land is a strip 84 varas wide and 1810 varas long, located on the south side of Chiltipin Creek in said county, lying between the east line of the Hunter and the west line of the Fessenden Surveys. As disclosed by the evidence the strip is claimed by plaintiffs to have been titled out of the State of Texas as part of a survey and patented in the name of Joseph Fessenden. The surface claimants, including Mr. Kretzmeier, in whose name the suit was brought, are residents of the county and use the land for farming.

On February 3, 1947, A. C. Strawn filed in the General Land Office an application to lease an alleged area of unsurveyed land in San Patricio belonging to the public free school fund, lying between the Joseph Fessenden survey and the H. H. Hunter survey. Corrected field notes of the Strawn application were filed on May 19, 1948, by Geo. W. King, Licensed State Land Surveyor, describing the land as set out in plaintiffs' petition. On July 6, 1948, after the notice and hearing required by Art. 5421c, sec. 6, Vernon's Ann.Civ.Stats., the Commissioner of the General Land Office found the land to be vacant and approved the Strawn application. On July 7, 1948, notice of this finding and approval was given all interested parties, and they were

notified of their rights as good faith claimants under Art. 5421c.

The Commissioner of the General Land Office took no further action on the application of Strawn and no award thereon was issued, for on September 27, 1948, plaintiffs filed their original petition against Strawn and defendants Giles and Daniel, claiming title to the land.

On October 1, 1948, plaintiff, Magnolia Petroleum Company, joined by the royalty and surface owners, filed in the General Land Office their application to purchase the vacancy as good faith claims, though denying the existence of the vacancy which they applied to purchase.

On March 25, 1949, plaintiffs filed their amended petition in which they alleged that their suit was brought under Sec. 6(j) of Art. 5421c. On June 16, 1949, defendants Giles and Daniel filed their plea in abatement to this petition, asking that the suit be dismissed on several grounds. This plea was overruled after hearing on July 17, 1948, and this action of the court is assigned as error.

Defendants Giles and Daniel likewise filed their original answer, raising certain exceptions to the plaintiffs' amended petition, and pleading not guilty and general and special denials. These exceptions were presented and overruled and the case was tried in San Patricio County to a jury.

At the trial defendants Giles and Daniel appeared. Strawn made no appearance in person or by counsel. Neither did he appeal from the judgment.

Upon close of the evidence defendants Giles and Daniel moved for an instructed verdict, which was overruled, and the case was submitted to the jury on special issues, which were answered by the jury favorably to the plaintiffs. The issues are:

"Special Issue No. 1: Do you find from a preponderance of the evidence that the surveyor James O. Gaffney located on the ground the west line of the Fessenden Survey as being the east line of the Henry H. Hunter Survey?", to which the jury answered "Yes."

"Special Issue No. 2: Do you find from a preponderance of the evidence that the surveyor, James O. Gaffney, was mistaken as to the actual location on the ground of the east line of the Henry H. Hunter Survey?", to which the jury answered "He was not mistaken."

Defendants' Special Requested Issue No. 1 was: "Do you find from a preponderance of the evidence that the N. W. corner of the Catherine Dougan Survey, as located by the original surveyor, lies at a point on the south bank of Chiltipin Creek, which is N. 42.25 vrs. and E. 31.7 vrs. from a concrete monument?", to which the jury answered "No."

After the verdict of the jury defendants Giles and Daniel moved for a judgment non obstante veredicto, which was overruled, and afterwards filed amended motion for new trial, which was also overruled. They then and there excepted and perfected their appeal to the Court of Civil Appeals.

The appellants' first and second points are as follows:

"1. The jury's findings 'that the surveyor James O. Gaffney located on the ground the west line of the Fessenden Survey as being the east line of the Henry H. Hunter Survey', and that 'he was not mistaken' as to the actual location on the ground of the east line of the Hunter, are not supported by the evidence and are against the evidence, and the court therefore erred in entering judgment thereon and in overruling defendants' motion for new trial."

"2. A vacancy between the Hunter Survey and the Fessenden Survey exists as a matter of law and according to the undisputed evidence, and the court therefore erred in overruling defendants' motion for instructed verdict, for judgment non obstante veredicto and for a new trial."

The parties will be referred to as they were in the trial court. The General Land Office will be referred to as the G.L.O.

■■ This case culminated in the trial court in nothing more or less than a boundary suit. Ordinarily the issue of boundary is a question of fact for the jury, unless the evidence shows as a matter of law that no issue of fact exists. Wilkins v. Clawson, 37 Tex.Civ.App. 162, 83 S.W. 732; Bell v. Preston, 19 Tex.Civ.App. 375, 47

S.W. 375; Taylor v. Lewis, 36 Tex.Civ. App. 305, 81 S.W. 534; Kirby Lbr. Co. v. Stewart, Tex.Civ.App., 161 S.W. 372; Mc-Cormack v. Crawford, Tex.Civ.App., 181 S.W. 485; Bivins v. Lanier, Tex.Civ.App., 186 S.W. 779; Mid-Kansas Oil & Gas Co. v. Burton, Tex.Civ.App., 87 S.W.2d 338 (er.dis.); Hart v. Greis, Tex.Civ.App., 155 S.W.2d 997 (er. ref. w. o. m.); Simmons v. Weis, Tex.Civ.App., 131 S.W.2d 103, 108; Morgan v. Darlington, Tex.Civ.App., 192 S.W.2d 327. It is also the rule that where the evidence upon issues is conflicting and the findings of the jury are supported by sufficient evidence, such findings are binding upon the courts. Antone v. Hoffman, Tex.Civ.App., 256 S.W. 656; Humble Oil & Ref. Co. v. Robertson, Tex.Civ.App., 48 S.W.2d 713; Merrill v. Louisiana Ry. & Nav. Co., Tex.Civ.App., 4 S.W.2d 568.

The evidence shows that Surveyor W. R. Reid, in 1854, located and surveyed five locations, including the Dougan Survey. Deputy District Surveyor P. S. Hagy made certain locations in said county. In 1857 he located the Henry H. Hunter 160 acres; in 1858 the Thos. T. Williamson LS 55 640 acre survey; in 1859 the Edm'd. Quirk 180 acre survey; in 1860 he located the Ambroz Andrews 1280 acres.

Hagy's fieldnotes of the Hunter Survey were:

"Beginning at a stake set in the mouth of a ravine S. 37½°W 5284½ vrs. from the N. W. corner of a survey of 160 acres surveyed as a preemption for Thomas M. Coleman;

"Thence N. 37¼ W. 178 20⁄100 vrs. Thence S. 77 W. 556 6⁄10 vrs. Thence S. 34¼ W 344½ vrs Thence S 11½ E 118 8⁄10 vrs. Thence 62½ E 392 vrs Thence S 3 E 130 9⁄10 vrs Thence S 43½ W 287½ vrs to a stake set for the NW corner of this survey and a hackberry marked V 4 inches diameter bears S 20¾ E 219 4⁄25 vrs.

"Thence South 944 46⁄100 vrs. to a stake set for the S. W. corner of this survey

"Thence East 475 4⁄25 vrs. to a stake set for the South East corner

"Thence North 1810 vrs. to the place of beginning."

These fieldnotes were filed in the General Land Office in March, 1857. After recording the fieldnotes in the General Land Office, where the call was to begin at a stake in the mouth of a ravine and immediately following the word "ravine" there was interlined in ink the words "the NW corner of A. Andrews and", making the beginning point to call for a stake set in the mouth of a ravine the NW corner of A. Andrews, a patent was issued to John H. Woods, assignee of Hunter, which called to begin at a stake in the mouth of a ravine the NW corner of A. Andrews and included the exact calls as contained in the fieldnotes as originally filed.

The Thos. T. Williamson L S 55 Survey of 640 acres west of and adjoining the Hunter Survey called to begin at the Hunter NW corner and then going west up Chiltipin Creek with its meanders setting them out and calling for ravines as he passed for a stake to the NW corner, which he identifies by a hackberry marked V as running south from this corner, then west he ran north past the southwest corner of said Hunter Survey to the place of beginning. The Williamson fieldnotes were filed in the G.L.O. on June 18, 1858.

On January 25, 1859, he located a survey in the name of Edm'nd Quirk. This survey was 180 acres of land made for Edm'd. Quirk, it being one-half of the quantity of land to which he was entitled by virtue of headright certificate No. 14 for 320 acres of land. This survey is on Chiltipin Creek. Mr. Hagy began at the Williamson NE corner calling for the hackberry marked V, which he had previously used to witness the Hunter NW corner. From this point he went east down the Chiltipin Creek with its meanders setting them out and using the same distances, but reversing the calls which he had used for the north creek calls of the Hunter and using an additional call at the end of his creek run, ie: E. 36 vrs. to a stake set for the NE corner of this survey.

On the 12th day of November, 1860, he located the Ambroz Andrews 1280 acres on the vacant land between the Hunter on the west and the Dougan on the east. The calls are:

"Beginning at the NW corner of a survey of one labor of land made for Daniel C. Doughty, assignee of Catherine Dougan, from which a lone hackberry 10 in dia marked X brs N 85¾ E. 95 vrs. and also another hackberry 6 in dia mk E vrs N 63 E 134 vrs.

"Thence up said creek with its meanders S 47½ W 150 vrs. S 80 W 600 vrs S 11 E 480 vrs S 44½ W 320 vrs S 76½ W 400 vrs S 55 200 vrs S 200 vrs ——— S 19 E 260 S 55 W 260 West 397 vrs to a stake set for the NE corner of a survey of 180 acres of land made in the name of Edm'd. Quirk.

"Thence South with the East boundary line of said survey at 1925 vrs for its SE corner at 3060 vrs to a stake set for the SW corner of this survey

"Thence East 1785 vrs to a stake set for the SE corner

"Thence North at 4019⁹⁄₁₀ vrs for the SW corner of said Doughty Survey at 4930 vrs. to the place of beginning."

These fieldnotes were filed in the G.L.O. on March 18, 1861.

On August 13th of the same year the Land office determined that the Andrews' fieldnotes did not close and the file was endorsed "Error W 60 V". No patent was issued to Andrews. The file wrapper bears the endorsement "Forfeited for non return of uncond. certificate by July 29, 1872." The Andrews Survey was abandoned but its fieldnotes were adopted on October 14, 1871, by Jno. Ryan, Deputy Surveyor of San Patricio County, as fieldnotes for a survey made on that date for the Joseph Fessenden Survey.

About 1861, James O. Gaffney became Surveyor of said county. Prior to September, 1873, he located surveys west of the Hunter and Fessenden Surveys which are not directly involved with the land in question, but the evidence shows that in his later work he referred to and relied on these locations in his work involving the Fessenden. In November 1861, he located two 320 acre surveys for Thos. Waelder, assignee of Henry O'Neal. On November 21, 1861, he located the Thos. Amarro Survey for John Wood, who was the owner of

the Hunter. On March 17, 1873, he located the Jno. Gravis 320 acre survey. Between the 24th and 29th of September, 1873, Gaffney did considerable surveying, which his report to the G.L.O. on May 15, 1875, discloses and does involve the Hunter and Fessenden Surveys. His report is as follows:

"Sept. 24th, 1873

"Began at the N. W. corner of a Preemption in name of Thomas N. Coleman which I have marked and designated on the map by the letter A. Said corner was shown to me by Mr. Thomas Coleman the original grantor of said preemption. Thence South 1000 vrs. with his west line to a stake in prairie. Thence West across a survey in name of C. W. Egery and two surveys in name of Edward Hardy 1622 vrs. to a stake set on East line of Catherine Dougan's Survey. Thence South with said line of said survey 1218 vrs. to a stake in prairie. Thence West 500 vrs. across said survey (Ran North to creek and found corner designated on map by Letter B correct, bearing tree still standing. Thence South 2420 vrs. with Fessenden's East line to a stake in prairie. Thence West across said survey 1785 vrs. Thence South 250 vrs. Thence West across Hunter's preemption 475 vrs. to a stake set on bank of Chiltipin. Went up to Cansado ranch and passed the night.

"Sept. 25th 1873.

"Began at the mouth of Willow Creek at the N. W. corner of the abandoned Hodge Preemption, which is the N. W. corner of C. C. Hornesby's location at present, (bearing tree still standing) which I designate on map by letter C. Thence South with said Hornesby's west line 750 vrs. to one of his corners. Thence East 1400 vrs. (Ran N. to creek and found Amarro's corner correct). Said corner I designate by letter D. Continuing East across said Amarro 740 vrs. set stake and ran North to Chiltipin finding O'Neill N. W. corner (designated E, correct, bearing tree still standing, continue East 2688 vrs. across both of the O'Neill tracts (ran N. to creek and found corner correct. Continued my East line 1900 vrs. across L. S. 55 and thence North

with its East line 1845 vrs. to its N. E. corner on the Chiltipin (designated F) finding a conflict existing between it and Hunter's preemption of 111 vrs. This conflict was caused by my giving the day before in running West to Fessenden the front called for in his field notes which the space ·between Dougan and Hunter would not admit of. Having a statement from G. L. O. that it did not close pc. I corrected it (Fessenden) immediately and gave it its true front of 1674 vrs.

### "Sept. 26, 1873.

"Began at the N. W. corner of Julian Durrion's lower survey (bear tree still standing) designated G. Thence South 433 vrs. Thence East across said survey 1275 vrs. Thence North 725 vrs. to creek, his N. E. corner designated H (bearing tree still standing.) Thence down the Chiltipin with its meanders as called for in the field notes of the John Smith survey S. 46 E. 100 vrs. S. 64 E. 223 vrs. S. 36 E. 300 vrs. S. 67 E. 390 vrs. S. 5 W. 530 vrs S. 14 E. 720 vrs. S. 56 E. 550 vrs. S. 80 E. 312 vrs. N. 69 500 vrs. S. 64¼ E. 139 vrs S 18½ E 184 vrs. to a stake set for its N. E. corner and as a mark to connect survey's bg.

### "Sept. 27 1873

"Began at George Reynold's N. W. corner marked 1 on map (the bearing trees are still standing on the bank of the Chiltipin) thence down said Chiltipin and bay with its meanders as given in the Reynold's field notes and fixed its N. E. (Reynold's corner, tried to run meanders of Williams and Downe's survey from this corner ot Reynold's but could not a large salt water flat preventing. The meanders would run through this flat and not on elevated ground as called for in the field notes of said Williams and Downes. Went back to Reynold's N W corner marked I and ran west or up the Chiltipin N 60 W 1000 vrs S 30 W 1825 vrs North 60 W 604 vrs. South 70 W 250 vrs to a stake set on the west line of Elisha Maxey's survey. Thence across the Samuel Wood's survey meandering the nearby land bordering the said Chiltipin South 74¾ W 159 vrs. South 52 W 463 vrs. South 37 W 400 vrs. North 86¾ W 408 vrs. N 69¾ W 402 vrs. N. 40¾ W 273 vrs. finding Samuel Woods' Survey overlapping the John Smith 475 vrs. North 60 W. Thence South 30 W with Wood's west line 4598 vrs. a stake in prairie.

### "Sept. 28th 1873.

"Began where I left off yesterday, South 60 E 1402 vrs. South 39 E. 766 vrs. betting on base line of Major Blucher run and measured by him in 1872. Continuing on it, South 60 E. 3950 vrs. to 3 mile post set by Blucher on said base line marked 111. In order to satisfy myself better as to the correctness of Blucher's line, I here stopped and went to the Southeast Corner of the Rafael Martines survey. (A bearing tree still standing) Thence North 48 E 1820 vrs. South corner of Larkin Martin; thence North 60 W 2645 vrs. N. 30 E. 1900 vrs. N. 60 W. 534 vrs. N. 30 E. 1035 vrs. to Blucher's base line as above mentioned. Thence with said line N. 60 W. 4280 vrs. from this point Levi English South corner bearing tree live oak X bears South 4 E 147 vrs. (Point designated by letter K) Continuing said line 8600 vrs. Mud Flat—offset toward St. Mary's north 30 E. 2320 vrs. N. 60 W. 4260 vrs. N. 30 E. 5591 vrs. to a point N. 60 W. 513 vrs. from George Reynold's N. W. corner marked I as aforesaid.

"The positions of all the surveys calling for bearing trees are truly located on the map, I having found the bearing trees or most of them in 1873 and last year, 1874, I run off the locations calling for the old surveys as found by me on the ground and as appears on the accompanying map. All of the foregoing I certify is true and correct.

"James O. Gaffney."

After making these surveys he sent to the G. L. O. a certificate of his corrected fieldnotes of the Fessenden Survey. This certificate is as follows:

"State of Texas
San Patricio County:

"I, James O. Gaffney, County Surveyor in and for the aforesaid County and State, do hereby certify that I have corrected the fieldnotes of a survey in the name of Joseph Fessenden of 1280 acres in the manner herein below described, to-wit

"In last meander on creek erased 397 vrs. and inserted 343 vrs. In West boundary erased 3060 vrs. and inserted 3278 vrs. South boundary erased 1785 vrs. and inserted 1674 vrs. East boundary line erased 4930 vrs. and inserted 5149 vrs. and I do further certify that I found it in conflict with a Preemption in the name of H. H. Hunter overlapping it 111 vrs and that I have corrected by leaving out said conflict and extending it south for quantity. Given under my hand at my office in San Patricio this July 17th, 1874.

> "James O. Gaffney
> Co. Sur. S. P. Co."

With the corrected fieldnotes of the Fessenden that he sent to the G.L.O. he also sent a map that he had prepared, which described the surveying he had done, and his map shows the Fessenden Survey adjoining the Hunter. This map bears the file date of May 15, 1875. After his surveying by which he corrected the fieldnotes of the Fessenden, he located the John H. Oltman Survey on May 13, 1874. His certificate of this survey bears date of July 17, 1874, which is the same date his certificate bears on the corrected fieldnotes of the Fessenden. The Oltman fieldnotes are as follows: "Beginning at the Southwest corner of a preemption tract surveyed for H. H. Hunter, thence South 2118 varas along the East Boundary line of L. S. 55 to its S. E. corner, thence East with the North boundary of a survey made for the widow and heirs of Manuel Ramon at 104 varas pass its N. E. 1724 varas to a stake in prairie for the S. E. corner of this survey, thence North 650 vrs. to a stake set on Fessenden's South line in prairie for the N. E. corner of this survey, thence West with the said line of the said survey 1249 varas to his S. W. corner, thence North with his West boundary 1468 varas to the S. E. corner of a survey in the name of Hunter as aforesaid, thence West 475 vrs. with his South line to the place of beginning."

It is evident that the fieldnotes of the Fessenden had been corrected prior to the Oltman Survey, for the reason that the relocated corners of the Fessenden are recognized in its calls and also calls for the Southeast corner of the Hunter.

Plaintiffs introduced their surveyor, Mr. D. C. Howard, who surveyed the area in question approximately a year before the case was tried. He testified that he found no vacancy. He also prepared a map showing the lines he ran, which reflect no vacancy.

The statement of facts consists of more than 400 pages in addition to more than 100 exhibits, so it would be impracticable to give a full review of all the evidence introduced, but our purpose is to quote so much of the evidence as we deem sufficient to show support for the finding of the jury that Gaffney located on the ground the west line of the Fessenden Survey as being the east line of the Henry Hunter Survey, and that he was not mistaken as to the actual location on the ground of the east line of the Hunter.

The primary objective in locating a survey is to follow the footsteps of the surveyor by which is meant to trace on the ground the lines as he actually ran them in making the survey. Humble Oil & Ref. Co. v. State, Tex.Civ.App., 162 S.W.2d 119–132 (writ ref.).

The Hunter location was made by Hagy in 1857, the Quirk in 1859. This survey overlaid the Hunter and the fieldnotes were voided. Hagy located the Andrews 1280 acres, now the Fessenden, in 1860. Before the Hunter patent was issued the Andrews fieldnotes had been filed in the General Land Office and the fieldnotes of the Hunter had been changed, calling to begin at the mouth of a ravine the Northwest corner of the Andrews. No patent ever issued to Andrews. Ryan adopted Hagy's fieldnotes of the Andrews for the Fessenden. It was determined by the G. L. O. that the fieldnotes did not close. Gaffney's report to the G. L. O. of May 15, 1875, of the surveying he did in September, 1873, shows that on September 24th he began at the Northwest corner of the preemption in the name of Thos. N. Coleman, which he marked and designated on the map by the letter "A"; thence S. 1000 varas with his West line to a stake in prairie; thence West across a survey in the name of C. W. Egery and two surveys in the name of Edward Hardy 1622 varas to a stake set on the East

line of Catherine Dougan's Survey; thence South with said line of said survey 1218 varas to a stake in prairie; thence West 500 varas across said survey (Ran North to creek and found corner designated on map by letter B, correct, bearing tree still standing), this point is also the N. E. corner of the Fessenden; thence South 2420 varas with Fessenden's East line to a stake in prairie; thence West across said survey 1785 varas, width of the Fessenden as called for by Ryan; thence South 250 varas; thence West across Hunter's preemption 475 varas, the distance called for by Hagy, to a stake set on the bank of Chiltipin. On September 25th he began at the mouth of Willow Creek some three miles or more west and surveyed across several surveys, including the Amarro and the two O'Neills which he had previously located and surveyed, finding and identifying many of the original markers called for in the fieldnotes. He surveyed across Williamson's L. S. 55, 1900 vrs. the distance called for in its patent, and thence North with its East line 1840 vrs. to the Northeast corner on the Chiltipin. He said that he found a conflict with the Williamson's L. S. 55 and the Hunter of 111 vrs., but he further said that this conflict was caused by "my giving the day before in running West to Fessenden the front called for in his fieldnotes which the space between the Dougan and the Hunter would not admit of. Having a statement from G. L. O. that it did not close pc., I corrected it (Fessenden) immediately and gave it its true front of 1674 varas." His certificate which accompanied his fieldnotes and his map is further explanation of what he intended to do and what he actually did, same being as follows:

"State of Texas
County of San Patricio:

"I, James O. Gaffney, County Surveyor in and for the aforesaid County and State, do hereby certify that I have corrected the fieldnotes of a survey in the name of Joseph Fessenden of 1280 acres in the manner hereinbelow described, to-wit:

"In last meander on creek erased 397 varas and inserted 343 varas. In West boundary erased 3060 varas and inserted 3278 varas. South boundary erased 1785 varas and inserted 1674 varas. East boundary line erased 4930 varas and inserted 5149 varas. And I do further certify that I found it in conflict with a Preemption in the name of H. H. Hunter overlapping it 111 varas and that I have corrected by leaving out said conflict and extending it south for quantity."

When the corrected fieldnotes of the Fessenden were sent to the G. L. O. they were filed and endorsed: "Covers A. Andrews. Otherwise correct on map." A patent was issued to Fessenden a few days thereafter.

Thus it appears to us that the footsteps of Gaffney can be followed with reasonable certainty, and what he did was to take the 111 varas that he concluded overlapped the Hunter and extended the Fessenden Survey south in order to give it the quantity called for in the fieldnotes, and by so removing the supposed conflict he intended to and did fix the West line of the Fessenden as adjoining the East line of the Hunter. This is what he said he did in his certificate that he sent to the G. L. O.: "I do further certify that I have found it (Fessenden) in conflict with a preemption in the name of H. Hunter, overlapping it 111 varas, and that I have corrected by leaving out said conflict and extending it South for quantity." In support of his action in adjoining the Fessenden with the Hunter his map, prepared by him, based upon his survey, was sent to the G. L. O. with his certificate, showing the Hunter and Fessenden adjoining. It is reflected by his corrected fieldnotes that he did not prepare a new set of fieldnotes but only erased certain calls and inserted different calls, and extended it south in order to make up the quantity needed for said survey. The Ryan fieldnotes called for a joinder with the Quirk. Gaffney did not change this call. However, all parties concede that Gaffney did not intend to call for a joinder with the Quirk. As heretofore said, the Quirk overlaid the Hunter and its fieldnotes had been voided. He evidently overlooked said call for the Quirk in the original fieldnotes and neglected to strike

out the "Quirk" and insert therefor the "Hunter".

As further evidence in support of the jury's finding that Gaffney located on the ground the West line of the Fessenden Survey as being the East line of the Hunter Survey, while not conclusive, but evidentiary, to be taken into consideration by the jury, plaintiff introduced in evidence instruction from the G. L. O. to surveyors: "Care should always be taken to leave no small vacancies between surveys." In this connection we cite: Maxcy v. Boyles, Tex. Civ.App., 38 S.W.2d 630; Shell Petroleum Corportion v. Landers, Tex.Civ.App., 107 S.W.2d 509, 512. ·

■ After careful consideration of the evidence, we are of the opinion that the answers of the jury are sufficiently supported by the evidence, and the effect of such answers is that no vacancy exists between the East line of the Hunter and the West line of the Fessenden.

■ The defendants say that Gaffney's corrected fieldnotes of the Fessenden, wherein he fixes the East and West call for 1674 varas instead of 1785 varas, had the effect of pulling the West line of the survey away from the East line of the Hunter, and thereby created the vacancy in question. The plaintiffs say in reply: "The fact that Gaffney's East and West distance for the Fessenden now seems to be shorter than is required to reach the Hunter does not change the facts of his ground survey nor his intention in locating the Fessenden to fill the space between the Dougan and the Hunter. It merely shows that he made an error in his course and distance survey from the Dougan westerly across the Fessenden and the Hunter. Where the intention of a surveyor to adjoin a survey with another located or definitely locatable line of an adjoining survey is clear, the fact that he was in error in the distance called for has never been grounds for pulling the survey away from the adjoinder and limiting it to the call for distance in the fieldnotes. This can only be done where the footsteps of the surveyor can be followed in the evidence and it can be shown that he never actually reached the point called for." And cite:

Weatherly v. Jackson, 123 Tex. 213, 215, 71 S.W.2d 259. See also: Livingston Oil & Gas Co. v. Shasta Oil Co., Tex.Civ.App., 114 S.W.2d 378 (error dis.); 7 Tex.Jur., p. 123 states: "The rules for ascertaining the boundaries of grants are designed to carry out the intentions of the parties; when that is manifest all else must yield to and be governed by it. 'While the boundary cases do not always upon their face show that the decision rested primarily upon the rule of giving controlling effect to the intention of the parties, yet in the last analysis it will be found that the decision in all cases was based upon that fundamental principle.'" Ordinarily, a call for adjoinder will prevail over a call for course and distances. Blake v. Pure Oil Co., 128 Tex. 536, 100 S.W.2d 1009. A call for adjoinder is ordinarily given controlling effect over course and distance, except where it is proven that call for adjoinder was made by conjecture or under a mistaken belief as to location of adjoinder. Magnolia Petroleum Co. v. Jones, 138 Tex. 67, 158 S. W.2d 548; Camp v. Gulf Production Co., 122 Tex. 383, 61 S.W.2d 773. Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W. 2d 801, 104 S.W.2d 1, held that if a call for adjoinder is made through mistake, the general rule that such call is given controlling effect over call for course and distances is not applicable, but it does not always follow that course and distance calls will control, and the court is left free to construct survey in such manner as will best give effect to the intention to be determined from the entire description.

■ The Hunter patent called for the Northwest corner of the Andrews, which was the Northeast corner of the Hunter. The Hunter overlaid the Quirk. The Quirk Survey was voided. Ryan adopted Hagy's fieldnotes of the Andrews for the Fessenden. The G.L.O. determined Hagy's and Ryan's fieldnotes were defective. Gaffney thereafter re-located the Fessenden in 1873 and sent to the G.L.O. his report, his map, and certificate of corrected fieldnotes of the Fessenden. After the receipt of all of this information from Gaffney the G.L. O. issued a patent to the Fessenden based upon the corrected fieldnotes of Gaffney.

Viewed from all of this information in the possession of the G.L.O., we are of the opinion that it was the intention of the G.L.O. as well as Gaffney to fix the East line of the Hunter and the West line of the Fessenden as a common boundary. If we are correct in this view, the act of adjoining the two surveys would control over Gaffney's mistaken course and distance call of 1674 varas. Woods v. Robinson, 58 Tex. 655; Swisher v. Grumbles, 18 Tex. 164; Ruth v. Carter-Kelly Lumber Co., Tex.Civ.App., 286 S.W. 322; State v. Palacios, Tex.Civ.App., 150 S.W. 229.

Appellants' third point is: "The official letter from the land Commissioner approving the Strawn application to lease the vacancy between the Hunter east line and the Fessenden west line was admissible in evidence, and the court erred in excluding it."

The plaintiffs offered in evidence to the court, but not to the jury, for the limited purpose of showing jurisdiction, the following instruments:

Application to lease of A. C. Strawn.

Fieldnotes prepared by Geo. W. King and filed in the G.L.O.

Mailing list in the A. C. Strawn file, and the Notice of Approval of A. C. Strawn's application.

Photostatic certified copy of file jacket in the A. C. Strawn application which has noted thereon all the actions taken by the Commissioner.

Application to Purchase (Good Faith Claimant) By C. R. Kretzmeier and the other plaintiffs in the case, filed in the G. L.O., and endorsed "Referred to Law,".

Field notes (Good Faith Claimant) in file S.F. 14938 of R. S. King, County Surveyor of San Patricio County.

File Jacket in S. F. No. 14938 (Good Faith Claimant) with the contents thereof, and with the notation thereon reading: "Suit pending with respect to this vacancy. No action should be taken until judgment received."

The defendants offered the official letter from the General Land Commissioner to Strawn approving his application and classifying and valuing the land. Plaintiffs objected to said letter and the court sustained said objection, to which the defendants now assert error upon the part of the trial court, and cite in support thereof Vernon's Ann.Civ.Stats. Arts. 250–258, and Weatherly v. Jackson, 123 Tex. 213, 215, 71 S.W.2d 259, at page 268.

Article 5421c and its subsections was passed by the Legislature in 1939, regulating the sale and lease of public school land and suits brought to determine whether a vacancy exists, and Sec. (e) thereof prescribing the duties of the Land Commissioner provides in part: "If it shall appear to [him] that the alleged vacancy is not in conflict with land previously titled * * * provided further that no presumption shall obtain in any suit involving the existence of a vacancy, as a result of the action of the Commissioner in this respect."

We have been cited to no authorities directly in point on this question. The letter, however, reflected only the opinion or conclusions of the Commissioner, and if admitted the jury could have used it for an improper purpose and could have presumed that a vacancy did in fact exist by reason of the personal opinion of the Land Commissioner, and such effect would have been prejudicial to the rights of the plaintiffs. It has been held that any irrelevant evidence is inadmissible for the reason that it might confuse and mislead the jury. Myers et al. v. Thomas et al., 143 Tex. 502, 186 S.W.2d 811.

We are of the opinion that the rule laid down in respect to the official acts of the Industrial Accident Board should apply in this instance. Article 8307, Sec. 8, Vernon's Ann.Civ.Stats., provides that any order, award or proceedings of said Board when duly attested by any member of the Board or its secretary, shall be admissible as evidence of the act of said Board in any court of this State; but it has been held many times that its records are not admissible to establish any issuable fact upon the main trial of the case. They are usually admitted before the court in order to show jurisdiction. Federal Underwriters Exchange v. Rigsby, Tex.Civ.App., 130

S.W.2d 1105; Federal Underwriters Exchange v. Ener, Tex.Civ.App., 126 S.W. 2d 769; Myers v. Thomas, 143 Tex. 502, 186 S.W.2d 811; Texas Employers Ins. Ass'n v. Downing, Tex.Civ.App., 218 S.W. 112. We therefore overrule this point.

Plaintiffs' fourth and last point is: "The court had no jurisdiction to try this cause involving the State's title either inherently or under Article 5421c, there having been neither an invasion of plaintiffs' possession by defendant State officials nor an award of the vacancy to Strawn, and defendants' plea to the jurisdiction and in abatement should have been sustained and the suit dismissed." · They contend that until final action had been taken by the Land Office, the rights of the various claimants could not be fixed; and since no award had been or has been issued, the title to the land is still in the State, and the District Court had no jurisdiction to entertain this suit and to enter judgment that plaintiffs recover the title from the State of Texas. They cite: Short v. W. T. Carter & Bro., 133 Tex. 202, 126 S.W.2d 953 at page 962–964; Walker v. Kenedy, 133 Tex. 193, 127 S.W.2d 163 at page 165; United Production Co. v. Hughes, 137 Tex. 21, 152 S.W. 2d 327 at page 330; Humble Oil & Refining Co. v. State, Tex.Civ.App., 162 S.W. 2d 119 at page 134; Potter, Lease and Sale of State Vacancies under the 1939 Law, 18 Tex. Law Review, 178, at p. 187.

▆▆▆▆ It is elementary that the plaintiffs not having obtained the permission of the State to bring their suit, it was fundamental error upon the part of the trial court in overruling the defendants' plea to the jurisdiction, unless the plaintiffs came within some exception of the statutes of this state. · Mr. Strawn filed his application with the General Land Commissioner to lease the alleged vacancy. The Commissioner had declared a vacancy existed and had approved said application subject to the rights of good faith claimants. In this Strawn was challenging the title of plaintiffs and was endeavoring to secure for himself possession of said land. The plaintiffs had only ninety days in which to file

as good faith claimants at a great loss if no vacancy existed. Under these circumstances, we are of the opinion that the plaintiffs would not have to wait until they had been ousted from their possession before they could bring suit against Strawn. Moody v. Holcomb, 26 Tex. 714, 719. Plaintiffs being aggrieved by the action of the Commissioner of the G. L. O. in declaring that such vacancy existed and approving said application, and the purpose of this cause being to determine whether a vacancy did or did not exist, they had a right to join in said cause the Commissioner and the Attorney General of this state under Article 5421c, subsection j, which provides: "Any person, firm, or corporation aggrieved by any action taken by the Commissioner under the provisions of this Act, or with reference to any application to purchase or lease vacancies, may institute suit in the District Court of the county where any part of the land is situated, but not elsewhere, and there try the issues of boundary, title, and ownership of any alleged vacancy involved, as well as the issues of the preference rights of such person, firm, or corporation, as herein provided. The plaintiff in such suit shall within thirty (30) days after the filing thereof cause a certified copy of the original petition therein to be served by any sheriff or constable of Travis County upon the Attorney General of Texas and the Commissioner, and cause such officer's return showing said service to be filed with the papers in said cause. Whether the Attorney General answers or intervenes in said cause or institutes suit in the first instance, following the filing of such application, the venue of all such suits shall be in the county where such land, or any part thereof, is located. When such litigation shall have been prosecuted to a final judgment, said judgment shall be binding upon the State of Texas. It shall be mandatory for the Attorney General to · intervene in behalf of the State in such cases." · Plaintiffs' fourth point is hereby overruled.

The judgment of the trial court is affirmed.